UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/30/2018

-------------------------------------------------------- X

ALPHA CAPITAL ANSTALT and ELLIS  :
INTERNATIONAL, LTD.,              :
                                 :
                                 :
                    Plaintiff,   :
                                 :          1:17-cv-1235-GHW
                                 :
          -v-                    :
                                 :     MEMORANDUM OPINION AND
                                 :            ORDER
SCHWELL WIMPFHEIMER & ASSOCIATES :
LLP, DOV SCHWELL, MICHAEL HUGHES, :
WILLIAM SCHMITZ, ADEEB SABA, and  :
MARK MATTHEWS,                    :
                                 :
                    Defendants.  :
-------------------------------------------------------- X

**GREGORY H. WOODS, United States District Judge:**

In an effort to develop an efficient and affordable power co-generation system for residential

and commercial buildings, a New York startup, Arista Power, found itself in need of funding for its

projects. Instead of seeking third-party loans, Arista affiliates contrived a plan to privately sell stock

options in its company that were held by family members of an Arista consultant and known

securities-law violator. With the help of counsel, Arista officers put the plan into action, sparking

sales that ultimately led to approximately $1 million in capital influx. At the same time, however,

Arista's public filings concealed the private stock sales and instead credited the capital infusion to a

loan that the company had secured from a third-party strawman. Following that raising of capital,

Arista was still faced with financing needs and sought Plaintiffs' investment. Arista representatives

spoke glowingly to Plaintiffs of the company's flagship project and its potential to light the way for

future growth. Plaintiffs invested, but less than two years later, Arista's lights went out when the

company filed for bankruptcy protection.

Plaintiffs brought this action against various Arista officers, the company's general counsel,

and the law firm of which two of the Individual Defendants are partners. Plaintiffs allege violations

of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as well as violations

of Section 20(a) of the Exchange Act and claims for common-law fraud. Defendants have all

moved to dismiss the amended complaint. Because Plaintiffs' allegations insufficiently plead loss

causation; Plaintiffs' reliance on the misstatements of certain Individual Defendants is precluded by

the parties' contractual agreements; and Arista's counsel is not pleaded to have made the alleged

misleading statements, Defendants' motions are GRANTED in their entirety.

## I.  BACKGROUND[1]

### A.  The Key Players in the Alleged Fraud

Arista Power ("Arista" or "the Company") is a New York corporation headquartered in

Rochester, New York that was formerly known as Future Energy Solutions, Inc. and WindTamer

Corp. Amended Compl., ECF No. 74, ¶ 25. As WindTamer Corp., the company purported to

develop and sell wind turbines and was first quoted publicly in November 2009 on the OTCQB

with ticker symbol WNDT. *Id.* In 2010, the company developed its "Power on Demand" system,

which utilized "inputs from multiple energy sources including solar, wind, fuel cells, generators, and

the grid, in conjunction with a custom-designed battery storage system and a proprietary smart

monitory technology, to release energy at optimal times to reduce peak power demand, thereby

lowering electricity costs." *Id.* ¶ 26. The first Power on Demand system was commissioned in the

first quarter of 2011. *Id.* In conjunction with this shift in business operations, from development

and sales of wind turbines to the more comprehensive Power on Demand system, WindTamer

changed its name to Arista Power and its ticker symbol to ASPW in May 2011. *Id.* ¶ 27.

---

[1] Unless otherwise noted, the facts are taken from the amended complaint and are accepted as true for the purposes of this motion. *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

At all times relevant to the issues raised in this case, Defendant William Schmitz served as Arista Power's chief executive officer ("CEO") and was a member of the company's board of directors. *Id.* 18. Defendant Adeeb Saba served as Arista's chief operating officer ("COO"). *Id.* ¶ 19. Defendant Mark Matthews served as Arista's president in 2012 and 2013, and was thereafter a representative and agent of the company. *Id.* ¶ 20.

Defendant Schwell Wimpfheimer & Associates LLP ("SWA") is a law firm with offices in New York, New York. *Id.* ¶ 17. SWA was at all relevant times primary outside counsel to Arista Power. *Id.* During the relevant period, SWA's managing partner, Defendant Dov Schwell, also served as the chairman of the Arista board of directors and a member of the board's audit committee. *Id.* ¶ 16. As of April 28, 2010, Schwell also served as an Arista director. *Id.*

Defendant Michael Hughes is an attorney admitted to the bars of the States of New York and New Jersey and a partner at SWA. *Id.* ¶ 15. Hughes was initially retained as a legal consultant to Arista Power in July 2008. *Id.* Five years later, in July 2013, Hughes assumed the role of Arista's general counsel. *Id.*[2] Hughes also served as an executive officer of the Company. *Id.* ¶ 8.[3]

Non-party Peter Kolokouris joined Hughes in becoming a consultant to Arista Power in July 2008. *Id.* ¶¶ 34, 38. Twenty years earlier, Kolokouris had been charged by the SEC with securities fraud in connection with his alleged misappropriation of proceeds from an initial public offering of North Atlantic Fisheries, Inc. and his alleged receipt of illegal kickbacks from an underwriter. *Id.* ¶ 32. In connection with those charges, Kolokouris entered into a consent settlement with the SEC, under the terms of which he resigned as an officer and director of North Atlantic Fisheries and

---

[2] Collectively, Defendants Hughes, Schmitz, Schwell, Saba, and Matthews are referred to as the "Individual Defendants."

[3] Hughes asserts that Plaintiffs' allegations give him an "erroneous promotion" and that he never served as Arista's general counsel or as an executive officer. Hughes's Mem. in Supp. of Mot. to Dismiss, ECF No. 94 ("Hughes Mem.") at 21-22. However, for purposes of a motion to dismiss, the Court must accept as true the facts pleaded in the amended complaint. *See Chambers*, 282 F.3d at 152.

other entities; agreed to an injunction prohibiting him from serving as an officer or director or owning fifty percent or more of the securities of a public company; and disgorged over two million dollars. *Id.* ¶ 33.

**B. Kolokouris and Hughes Partner with Arista**

On July 10, 2008, Kolokouris entered into a handwritten "Option Agreement" with Arista (then Future Energy) which granted Kolokouris options to purchase 166,000 shares of the company's stock—over fifteen percent of the Company's outstanding stock—at an exercise price of $1.00 per share. *Id.* ¶¶ 34, 40. Kolokouris subsequently assigned those stock options to entities affiliated with Kolokouris's family. *Id.* ¶ 41. In the related enforcement action, the SEC has alleged that the purpose of this stock transfer was to evade the bar that was imposed on Kolokouris in 1990 from owning five percent or more of the securities of a public company. *Id.*

The Option Agreement also granted Hughes, Kolokouris's attorney, options to purchase 167,000 shares of the company's common stock at the same exercise price of $1.00 per share. *Id.* ¶ 34. The Option Agreement contained a clause stating: "The Company acknowledges that Michael Hughes is an attorney and has represented the Investors and has not represented the Company." *Id.* ¶ 35.

On November 26, 2008, the Company disclosed that Hughes had "provided consulting services to the company in connection with its management structure and business development and product marketing strategies" since July 2008. *Id.* ¶ 36. The following year, the Company further disclosed that Hughes beneficially owned 1.66 million shares of the Company's stock through 609 MTH, Inc. and 7.89 million shares of Company stock through both 609 MTH, Inc. and another entity, 10EJH. *Id.* ¶ 37.

On March 30, 2009, the Company disclosed that Kolokouris had "acted as a consultant to the Company since July 2008 . . . provid[ing] consulting services involving advice and assistance on

its management structure and business development and developing a product marketing strategy and publicity strategy." *Id.* ¶ 38 (alterations in original). The Company also disclosed that Kolouris's consulting role had included "assis[ting] the Company in locating auditing services, legal services, and assistance in locating financial market professionals to assist the Company." *Id.* (alteration in original).

In addition to its disclosure regarding Kolokouris's role as consultant, the Company also disclosed at that time that "Hughes ha[d] acted as consultant to the Company since July 2008" and "[d]uring this time [ ] provided consulting services involving advice and assistance on its management structure and business development and developing a product marketing strategy and publicity strategy." *Id.* ¶ 39. The Company further disclosed that Hughes had "also assisted the Company in locating auditing services, legal services, insurance and assistance in locating financial market professional to assist the Company." *Id.*

### C. The Switch is Flipped on the Plot to Privately Sell Kolokouris Family Stock

In February 2011, Hughes, at Kolokouris's request, performed all of the legal work necessary to create TMK-ENT, Inc., an entity nominally owned and directed by Tim Davin, Kolokouris's neighbor. *Id.* ¶ 52.

Beginning in the summer of 2012, Arista faced difficulty in raising capital for its operations. *Id.* ¶ 42. Hughes and Schmitz, working with Kolokouris, recommended that Arista raise short-term capital through private sales of the stock options that had been transferred to the Kolokouris family entities. *Id.* Kolokouris would transmit payment from these sales to Arista after withdrawing cash from accounts that he controlled. *Id.* ¶ 43.

In late August 2012, Arista decided to put this plan into play. *Id.* ¶ 42. To effectuate the sales, Hughes and Schmitz, among other Arista affiliates, privately offered Kolokouris family stock to various of their acquaintances, including their friends, family members, tennis club associates, and

others. *Id.* ¶¶ 44, 60. Kolokouris directed Hughes and Schmitz with respect to what stock to sell, the amounts to sell, and the price at which to sell it. *Id.* ¶ 60. Kolokouris himself took various steps to manipulate the price of publicly traded Arista stock so that the privately offered stock could be sold at an apparent discount. *Id.* ¶¶ 44, 76. Specifically, Kolokouris executed "manipulative stock transactions" in his family members' brokerage accounts and marked the closing price of Arista stock on a number of trading days. *Id.* ¶ 76. In this way, Kolokouris was able to increase and maintain Arista's public market stock price at a price above $1.00 per share, while the private sales of Kolokouris family stock were made at a discounted price. *Id.* ¶¶ 44, 76.

In the fall of 2012, Hughes and Schmitz believed that the Company was legally required to disclose the influx of new capital. *Id.* ¶ 45. Accordingly, Arista's board of directors held a telephonic meeting on August 30, 2012 to discuss the funding. *Id.* ¶ 46. Among others, Schwell, Schmitz, and Hughes were in attendance. *Id.* The Company's CFO, charged with recording meeting minutes, took handwritten notes during the meeting. *Id.* Those notes indicated that Hughes discussed the idea of Arista "founder shares" being sold "privately to loan" funds to the Company; that Hughes, Schmitz, and another Company associate had already "locked in aprox $200K" in such private sales; and that Hughes and Schmitz planned to sell "up to $1 M[illion]" in stock. *Id.* (alteration in original).

The day after that meeting, the CFO emailed a typewritten draft of her minutes from the August 30, 2012 meeting to Hughes for his review. *Id.* ¶ 47. That draft included the following description of the potential new funding for the Company:

> Mr. Schmitz . . . explained, that . . . we are working on a financing plan with other [Arista] investors, who plan to sell a certain number of shares of [Arista's] stock, and will loan the proceeds from those private sales to [Arista]. Terms of the loan are being defined. There was a motion made by [Arista's Chairman] to allow Bill Schmitz and [the Chairman] to negotiate terms with the lender. [A Board member] seconded the motion and all were in favor.

*Id.* (alterations in original).

Ten days later, on September 10, 2012, Arista publicly filed with the SEC a Form 8-K that was drafted and reviewed by Hughes and signed by Schmitz, in his capacity as Arista's CEO. *Id.* ¶¶ 49-50. That 8-K stated:

> On September 4, 2012, [Arista] entered into a Loan Agreement with TMK-ENT, Inc. (the "Lender") providing for a $500,000 working capital revolving line of credit for [Arista]. Advances under the Loan Agreement, which will be evidenced by a committed revolving credit note (the "Note"), bear interest at 10% per year, payable annually. The Note matures on September 4, 2013, and all borrowings under the Loan Agreement are due and payable on that date.
>
> As additional consideration for entering the Loan Agreement, [Arista] issued to the Lender warrants with a 10-year term to purchase an aggregate of 500,000 shares of common stock of [Arista] at $1.80 per share pursuant to a Warrant Purchase Agreement (the "Warrant Purchase Agreement"). . . . The Lender is an accredited investor as defined under the Securities Act and Regulation D, was knowledgeable about [Arista's] operations and financial condition and had access to such information.

*Id.* ¶ 49.

TMK-ENT never loaned Arista the $500,000. *Id.* ¶ 53. Instead, "it was 'generally understood by Arista'" that the amount of the purported loan was entirely contingent on the funds generated by the sale of Kolokouris family stock and paid to Arista from Kolokouris-controlled accounts. *Id.* ¶ 55. An email sent by an Arista board member on September 23, 2012 to Schmitz, with a copy to Hughes and the Arista board, including Schwell, reflected this understanding, inquiring, "With the 500k [credit facility] nearly complete, would it be possible if founding members would be willing to sell more stock to increase the facility?" *Id.* Arista's CFO also understood the true source of the funding; in an October 20, 2012 email, she "admitted" as much when she stated, "we have gotten a line of credit from TMK Enterprises (Peter [Kolokouris] has agreed to sell some

of his stock to other investors, and is lending us that money)—10% interest—1 year loan." *Id.* ¶ 64 (alteration in original).

Also despite the 8-K's representations, as of the time of the September 2012 8-K filing, neither Arista nor TMK-ENT had executed the purported Loan Agreement, Warrant Purchase Agreement, or Note. *Id.* ¶ 56. Nor had TMK-ENT received any of the stated warrants. *Id.* Hughes and Schmitz knew that no such documents existed at that time. *Id.* It was not until September 26, 2012 that Hughes emailed a draft of the "TMK-ENT Credit Facility" to Schwell. *Id.* ¶ 59. In that email, Hughes explained that he was attaching the credit facility and related note and warrant, and that the facility was "very company friendly, with just a few real terms (barely) to make it arms-length." *Id.* In its investigation, the SEC found that the credit facility and related documents were not finalized until October 2012 at the earliest, after being drafted by Hughes and signed by Schmitz. *Id.* ¶¶ 56-57. The SEC also determined that Hughes and Schmitz caused the forms to be back-dated to September 4, 2012, thereby creating the appearance that the final documents had existed at the time of the September 2012 8-K filing. *Id.* ¶ 57. Plaintiffs allege that Hughes and Schmitz understood the loan agreement with TMK-ENT to be a "ginned-up 'agreement'" between Arista and the Kolokouris-controlled entity meant to "cover up Arista's actual dealings with Kolokouris" rather than an arms' length transaction. *Id.* ¶ 58.

The minutes of the August 30, 2012 board meeting were not finalized until October 2012. *Id.* ¶ 65. On October 22, 2012, the CFO re-sent her August 31, 2012 draft of the minutes to Hughes, asking him again to review them. *Id.* In a response sent later that day, Hughes sent the CFO a revised version of the minutes, which read:

> Mr. Schmitz . . . explained that . . . [Arista] is attempting to secure financing $500,000 loan from TMK-ENT, Inc., a current shareholder of [Arista]. Terms of the loan are currently being negotiated, but it was expected that the loan would have a term of approximately one year, have an annual interest rate of ten percent and that [Arista] would issue to the lender a warrant to purchase up to

> 500,000 shares of [Arista's] common stock at market price at the closing of the loan. The loan would not be secured by any of [Arista's] assets, and not guaranteed by any person.
>
> After a discussion, a motion was made by [a Board member] and seconded by [another Board member], whereupon the following resolutions were unanimously adopted:
>
> NOW THEREFORE, IT BE RESOLVED, the Company is authorized [to] enter into an agreement or agreements (collectively the "Loan Agreements") with TMK-ENT, LLC ("TMK") in which [Arista] would borrow up to $500,000 from TMK, with an interest rate of no more than ten percent per year . . . ."

*Id.* (alterations in original). Plaintiffs allege that, as borne out by the SEC's allegations, Hughes knew that this revision to the board minutes was false and deceptive because the board had not discussed a loan from TMK-ENT during the August 30, 2012 meeting and the revised minutes make no mention of the sales of "founders" stock. *Id.* ¶ 66. Plaintiffs further adopt the SEC's allegation that these revised minutes were intended to conceal the actual substance of the board's August 30, 2012 meeting and to conform it instead to the September 2012 8-K. *Id.* ¶ 67. The board, chaired by Schwell, adopted a final version of the minutes on October 24, 2012, after additional changes were made. *Id.* ¶ 68. The final minutes did not reference the sale of Kolokouris family stock. *Id.*

### D. The Deception Continues

Over the course of the next two years, Arista's public filings continued to make false and misleading statements, and contained material omissions, regarding the purported loan from TMK-ENT. *Id.* ¶ 69. The Company's Forms 8-K dated November 16, 2012, December 26, 2012, and May 30, 2013 falsely announced increases in the amount of the TMK-ENT loan, up to an ultimate sum of $1,250,000. *Id.* The following filings also contained related statements and omissions: Forms 10-Q dated November 13, 2012, May 13, 2013, August 13, 2013, November 12, 2013, May 15, 2014, August 14, 2014, and November 14, 2014; Forms 10-K dated March 28, 2013 and March 31, 2014; and Forms S-1 dated August 30, 2013, October 3, 2013, and April 30, 2014. *Id.* Schmitz,

in his capacity as Arista's CEO, signed each of these filings, and Schwell, as chairman of the Company's board, signed the Forms 10-K. *Id.* ¶¶ 69-70. Hughes drafted or "at least" reviewed the filings and "assisted in their filing." *Id.* ¶¶ 70, 72.

Plaintiffs allege that, at the time of those filings, Hughes and Schmitz knew or recklessly disregarded that TMK-ENT was controlled by Kolokouris and did not have any independent source of funds, that TMK-ENT did not transfer any of the funds received by Arista, and that the purported loan was a "fictitious cover" for Arista financing by Kolokouris through sales of his family stock. *Id.* ¶ 73. Thus, the filings were false and misleading in that they characterized the $1 million in capital influx as the result of a loan agreement or line of credit from a purported third-party lender, when in fact the capital was raised by a known securities law violator. *Id.* ¶¶ 72, 74. Plaintiffs also allege that the filings painted for the investing public a false and misleading picture of the independence and integrity of the Company's management. *Id.* ¶ 75.

Altogether, from September 2012 through February 2013, Hughes, Schmitz, and Kolokouris raised a total of at least $984,700 through private sales of the Kolokouris family stock, the proceeds of which were given to Kolokouris. *Id.* ¶ 63. Kolokouris then remitted $1,018,500 to Arista by way of thirteen cashier's checks made payable to Arista with a handwritten memo that read "TMK Enterprises." *Id.* Arista never repaid any of these monies, to TMK-ENT or anyone else. *Id.* All communications between Hughes and Schmitz and TMK-ENT during the relevant periods were with Kolokouris, and not with the corporation's legal owner. *Id.* ¶ 52.

At some point in 2013, the SEC opened an investigation into Arista Power and Kolokouris. *Id.* ¶ 28. In connection with that investigation, the SEC issued various subpoenas to the Company and related individuals, including to Hughes. *Id.*

### E. Plaintiffs Are Persuaded to Invest in Arista

Plaintiffs Alpha Capital Anstalt and Ellis International Ltd. are foreign entities, organized under the laws of Lichtenstein and Panama respectively. *Id.* ¶¶ 13-14. They were solicited by Arista in 2014 to invest in the Company. *Id.* ¶ 79. By early 2014, Arista was publicly representing its energy business engagements as two-fold: (1) the Company was developing and installing its proprietary Power on Demand ("POD") system, and (2) the Company was engaged in selling solar energy systems. *Id.* ¶ 77. The POD system, Arista explained, stored energy from a variety of sources, including solar, wind, and fuel cells, and used the Company's proprietary technology to release energy at optimal times in order to maximize energy efficiency and reduce energy costs. *Id.* ¶ 78. Arista advertised its system as a "transformative technology," a key that would unlock the Company's growth. *Id.*

In February 2014, Defendants Saba and Matthews met with Plaintiffs' representatives, Yosef Milgrom and Jay Spinner, in an effort to solicit Plaintiffs' investment in Arista securities. *Id.* ¶ 79. During that meeting, Saba and Matthews represented that the Company's POD system would more efficiently manage energy distribution and would cost less than alternative energy sources. *Id.* Saba and Matthews emphasized the critical importance of Arista's POD pilot project, which they both claimed was "already underway" at a residential building known as Rose/City Lights in Queens, New York (the "Rose/City Lights Project"). *Id.* Saba and Matthews described the project to Plaintiffs' representatives as the first large-scale application of the POD system which, if successful, would serve as the prototype for future projects and likely generate more significant opportunities for commercial application of the system in other buildings. *Id.* ¶¶ 80, 81. Saba and Matthews both advised Plaintiffs' representatives that Arista had already begun discussions with other buildings about installing the system. *Id.* ¶ 80.

Also during the February 2014 meeting, as well as in follow-up conversations, Saba and Matthews each stated that the Company needed Plaintiffs' investment funds to "quickly complete the installation of the Rose/City Lights Project," which they anticipated would be done within 120 days of procuring such funds. *Id.* ¶ 81. Overall, Arista expected to raise $1.5 million, funding which would permit Arista to finish installation and which Saba and Matthews both represented was the only impediment to completion of the project. *Id.* ¶ 82. At no point during that meeting, or in conversations thereafter, did Saba or Matthews disclose to Plaintiffs that the SEC was investigating the Company. *Id.* ¶ 88.

Based on the representations by Arista, Saba, and Matthews, and pursuant to a Securities Purchase Agreement ("SPA") dated March 31, 2014, Plaintiffs collectively invested $955,000 in Arista preferred stock, with Alpha Capital investing $800,000 and Ellis International investing $155,000. *Id.* ¶¶ 86, 88. Schmitz signed the SPA on behalf of Arista, as well as the Registration Statement filed with the SEC pursuant to which the securities were sold to Plaintiffs. *Id.* ¶ 87. Plaintiffs allege that, in deciding to invest in Arista, they also relied on representations made in an opinion letter authored by SWA. *Id.* ¶ 89.

Plaintiffs later learned that, at the time of the February 2014 meeting with Saba and Matthews, Arista had no personnel on the premises of the Rose/City Lights Project. *Id.* ¶ 83. Plaintiffs also learned that, at both the time of the February 2014 meeting and also at the time of the March 31, 2014 investment, Arista had yet to begin installation of the POD system and had not even secured the permits and approvals from the New York City Department of Buildings, the New York State Energy Research and Development Authority, and from Con Edison that were necessary to commence work on the project. *Id.* ¶¶ 83-84. Nor had Arista submitted all of the required permit applications prior to Plaintiffs' investment. *Id.* ¶ 84. Plaintiffs therefore allege that the statements by Saba and Matthews that installation of the Rose/City Lights Project was already underway and that

capital procurement was the only impediment to completion of the project within 120 days were patently false. *Id.* ¶ 85.

### F. Arista Loses Power

In January 2016, Arista filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of New York. *Id.* ¶ 90. As of the date of the amended complaint, that action remained pending. *Id.*

On June 19, 2017, while this case was pending, the SEC filed an action in the Southern District of New York, a case also before this Court, naming as defendants Arista and several related individuals and entities, including Schmitz, Hughes, and Kolokouris and several of his family members and affiliated entities. *Id.* ¶ 91. That case remains pending before this Court.

### G. Procedural History

Plaintiffs commenced this action on February 17, 2017. ECF No. 1. On May 30, 2017, Defendants filed motions to dismiss the complaint. ECF Nos. 61, 62, 65, 68. In lieu of opposing those motions, Plaintiffs filed an amended complaint on June 27, 2017. ECF No. 74. On July 28, 2017, Defendants Matthews, Saba, and Schwell filed motions to dismiss the amended complaint. ECF Nos. 81, 88. Six days later, on August 3, 2017, Hughes also filed a motion to dismiss the amended complaint. ECF No. 92. The next day, on August 4, 2017, Schmitz and SWA moved to dismiss the amended complaint as well. ECF Nos. 97, 100. On August 25, 2017, Plaintiffs filed an omnibus opposition to the motions to dismiss. ECF No. 110. Replies in support of the motions were filed by Defendants on September 8, 2017. ECF Nos. 111-14, 116.

On October 4, 2017, Plaintiffs filed a letter alerting the Court to a recent decision by the Court of Appeals for the District of Columbia, *Lorenzo v. Sec. & Exchange Comm'n*, No. 15-1202, 872 F.3d 578 (D.C. Cir. 2017), *petition for cert. filed*, (Jan. 31, 2018) (No. 17-1077), which Plaintiffs believe to be relevant to the arguments raised in the motions to dismiss here. ECF No. 117. On October

25, 2017, Plaintiffs filed a second supplemental letter, drawing the Court's attention to allegations in the amended complaint filed by the SEC in the related case in this district. ECF No. 118. On November 10, 2017, Defendants Schwell and Hughes filed a response to both of Plaintiffs' post-briefing letters. ECF No. 121.

## II. LEGAL STANDARDS

### A. Rule 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). To determine plausibility, courts follow a "two-pronged approach." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (alterations and internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678). Second, a court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679). Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Because claims under Section 10(b) of the Securities Exchange Act ("Exchange Act") and Rule 10b-5 thereunder sound in fraud, they are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA. *Novak v. Kasaks*, 216 F.3d 300, 306-07 (2d Cir. 2000). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy that requirement, the complaint must "(1) specify the

statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Novak*, 216 F.3d at 306). The PSLRA imposes similar requirements on claims brought under the Exchange Act: "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged misstatement or omission. 15 U.S.C. § 78u-4(b)(2)(A). A complaint will survive under that heightened standard "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

In resolving a motion to dismiss under Rule 12(b)(6), courts generally may not consider materials extrinsic to the complaint. Fed. R. Civ. P. 12(d). However, that rule is not absolute. In addition to the facts alleged in the complaint, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI*, 493 F.3d at 98. Courts may also consider "matters of which judicial notice may be taken," *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted), including documents that both "bear on the adequacy" of SEC disclosures and are "public disclosure documents required by law," *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).[4]

---

[4] The Court has not considered the allegations in the amended complaint filed by the SEC in the related enforcement

## III. DISCUSSION

Plaintiffs assert claims under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, as well as claims for control-person liability against the Individual Defendants under Section 20(a) of the Exchange Act and for common-law fraud.

### A. Fraudulent Misrepresentations Under Section 10(b) of the Exchange Act and Rule 10b-5

Section 10(b) of the Securities Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe." 15 U.S.C. § 78j(b). Promulgated under authority granted to the SEC by Section 10, Rule 10b-5 makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

To state a claim under Section 10(b) and Rule 10b-5 for fraudulent misrepresentations, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *GAMCO Investors, Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014)).

Under Rule 10b-5, "[w]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." *Chiarella v. United States*, 445 U.S. 222, 235 (1980). A corporation does not have a duty to disclose information simply because it is material. *Matrixx Initiatives, Inc. v.*

---

action. Plaintiffs brought those allegations to the Court's attention after the motions to dismiss were fully briefed, but more fundamentally, those allegations are not contained in Plaintiffs' amended complaint. Therefore, the Court does not consider them at this stage.

*Siracusano*, 563 U.S. 27, 44 (2011); *see In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)) ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact."). Similarly, a corporation does not have a duty to disclose information simply because it suggests the corporation or its employees engaged in uncharged illegal conduct. *See, e.g., In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) ("[T]he federal securities laws do not require a company to accuse itself of wrongdoing."). However, "[d]isclosure is required . . . when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading.'" *Matrixx*, 563 U.S. at 44 (omission in original) (quoting 17 C.F.R. § 240.10b-5(b)). Thus, "[w]hen a corporation does make a disclosure—whether it be voluntary or required—there is a duty to make it complete and accurate." *In re Marsh & Mclennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006) (citation omitted); *see also Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth."). A duty to disclose may also arise "expressly pursuant to an independent statute or regulation—i.e., an affirmative legal disclosure obligation." *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 561 (S.D.N.Y. 2011) (citation omitted).

Here, each of the Individual Defendants attacks the sufficiency of Plaintiffs' allegations of loss causation. Hughes additionally argues that he cannot be held liable for the allegedly false and misleading statements, that those statements were immaterial at the time of Plaintiffs' investment, and that Plaintiffs fail to plead reliance on those statements. Saba and Matthews contend that the Section 10(b) claims against them are time-barred, but that in any event the misstatements alleged to have been made by them are not actionable, that the SPA's merger clause precludes Plaintiffs' reliance on those statements, and that Plaintiffs have failed to plead scienter. The Court first

addresses the individual arguments raised by Hughes, Saba, and Matthews, then turns to loss causation.

### 1. Claims Against Hughes

#### a. Liability Under Rule 10b-5(b)

Hughes challenges the sufficiency of Plaintiffs' allegations with respect to his liability for any materially false or misleading statements, claiming that he was not the statements' "maker" and, under the holding of *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), cannot be held liable. The challenged statements include: (i) statements in the September 2012 8-K regarding the loan from TMK-ENT to Arista; (ii) statements in Arista's subsequent Forms 8-K announcing increases in the amount of the purported TMK-ENT loan; (iii) statements in Arista's Forms 10-Q; (iv) statements in Arista's Forms 10-K; and (v) statements in Arista's Forms S-1. Plaintiffs allege in the amended complaint that Hughes "drafted" and "reviewed" these SEC filings and, with the exception of the September 2012 8-K, "assisted" in the filing of the documents. Am. Compl. ¶¶ 50, 70, 72.

In *Janus*, the Supreme Court held that, in order to be liable for a violation of Rule 10b-5, a defendant must have "made" the allegedly material misstatements. 564 U.S. at 141. The Court explained that "make" means "to state," not "to create." *Id.* at 142, 144-45. The Court then set out the following rule for determining whether a defendant is the "maker of a statement": "For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus*, 564 U.S. at 142; *see also id.* at 144 ("Without [ultimate] authority, it is not necessary or inevitable that any falsehood will be contained in the statement"). The Court further explained:

> Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker. And in the ordinary case, attribution within a statement or implicit from surrounding

circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed. This rule might best be exemplified by the relationship between a speechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it is the speaker who takes credit—or blame—for what is ultimately said.

*Id.* at 142-43.

Plaintiffs assert that the holding of *Janus* is properly to be understood as limited to the facts of that case, that is, that *Janus* applies only when evaluating whether one corporate entity is liable for the statements of another corporate entity. *See* Pl.'s Opposition, ECF No. 110 ("Pl.'s Opp.") at 14; *see Janus*, 564 U.S. at 137 (applying the rule it enunciated and holding that Janus Capital Management, a mutual fund investment adviser, could not be held liable under Rule 10b-5 for false statements included in prospectuses issued by its client mutual funds, Janus Investment Fund). Thus, Plaintiffs contend, *Janus* is inapplicable to cases such as this one, in which the alleged maker of the statement is a corporate insider. Pl.'s Opp. at 14.

In an opinion published shortly after Plaintiffs' opposition was filed, this Court rejected that narrow reading of *Janus*. *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 637-41 (S.D.N.Y. 2017). As this Court explained in *Banco Bradesco*, not only did the *Janus* Court elect not to expressly limit its holding to the circumstances of that case, but it "expressly rejected the notion that it was sufficient for a defendant to have been involved in 'creating' the challenged statement by 'participating in the drafting of' the statement or by 'preparing or publishing a statement on behalf of another.'" *Id.* at 639-40 (brackets omitted) (quoting *Janus*, 564 U.S. at 144-46). Liability instead attaches only to those who "possessed ultimate authority over the statements at issue," and a plaintiff may sufficiently plead such liability by alleging facts that show, "either directly or circumstantially, that the individuals named in the complaint possessed [such] ultimate authority." *Id.* at 641; *see also Rose v. Rahfco Mgmt. Grp., LLC*, No. 13-cv-5804 (VB), 2014 WL 7389900, at *5 (S.D.N.Y. Dec. 15, 2014) (finding that, under *Janus*, plaintiff's allegations were insufficient to survive

dismissal when they failed to allege that the prospectuses at issue were issued by investment-adviser defendants or that "the statements therein came from those defendants"); *In re UBS AG Secs. Litig.*, No. 07-cv-11225 (RJS), 2012 WL 4471265, at *10 (S.D.N.Y. Sept. 28, 2012) (rejecting plaintiff's argument that *Janus*'s rule applies only to third parties and not to "corporate insiders responsible for the day-to-day affairs of a company"); *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 165 (S.D.N.Y. 2012) (noting that "nothing in the Court's decision in *Janus* limits the key holding . . . to legally separate entities").

Here, Plaintiffs' allegations with respect to Hughes's relationship to the allegedly false and misleading statements insufficiently plead that Hughes "made" the statements under the rule of *Janus*. As the individual who "drafted" the September 2012 8-K and "at least reviewed" the other statements, Hughes played a role much like that of a speechwriter, without any ultimate authority over the final content. Furthermore, although the amended complaint asserts in passing that Hughes "assisted" in the filing of the documents containing the statements, Plaintiffs' allegations do not suggest that he actually filed those documents or that he otherwise possessed ultimate authority over their content.[5] Absent such allegations of control, Plaintiffs fail to satisfy their pleading burden, and any claims under Rule 10b-5(b) against Hughes are dismissed.

### b. Liability Under Rule 10b-5(a) or (c)

Plaintiffs are not derailed by Hughes's arguments under Rule 10b-5(b) and confidently assert

---

[5] Indeed, the very case cited by Plaintiffs in support of Hughes's liability in fact undercuts Plaintiffs' theory. In *Boyd*, the District of Colorado explained that, "[u]nder *Janus*, an attorney who prepares a false statement to be disseminated to investors can be liable for the contents of that statement if the attorney has the ultimate authority over the contents and dissemination of the statement, but not where the attorney is simply preparing the statement at the direction of a client who is controlling the contents of that statement." *Secs. & Exchange Comm'n v. Boyd*, No. 95-cv-03174, 2012 WL 1060034, at *7 (D. Color. Mar. 29, 2012). Plaintiffs emphasize the first clause, but appear to ignore the second. The amended complaint's allegations, while describing a plan to defraud investors orchestrated in large part by Hughes, are sparse with respect to the circumstances surrounding the statements themselves. While Hughes is alleged to have asserted much greater control over the minutes of the August 30, 2012 board meeting, for example, he is not alleged to have had any ultimate authority over the content of the statements that were publicly filed. Instead, he is alleged to have participated in their drafting and to have reviewed them in his capacity as counsel to Arista.

that *Janus* does not preclude Plaintiff from bringing a claim for "scheme liability" under subsections (a) and (c) of Rule 10b-5. Plaintiffs are correct. Nonetheless, Plaintiffs' allegations still fail.

Subsections (a) and (c) of Rule 10b-5 make it "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) [t]o employ any device, scheme, or artifice to defraud, [or] . . . (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(a), (c). While *Janus* applies only to subsection (b) of Rule 10b-5, *SEC v. Pentago Capital Mgmt. PLC*, 725 F.3d 279, 287 (2d Cir. 2013), the Second Circuit has held that "where the sole basis" for claims brought under subsections (a) and (c) of Rule 10b-5 "is alleged misrepresentations or omissions," a plaintiff does not state a claim under Rule 10b-5(a) or (c). *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 177 (2d Cir. 2005); *see In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 161 (S.D.N.Y. 2012) ("[T]he three subsections of Rule 10b-5 are distinct, and courts must scrutinize pleadings to ensure that misrepresentation or omission claims do not proceed under the scheme liability rubric."). That is, subsections (a) and (c) may not be used as a "back door into liability for those who help others make a false statement or omission in violation of subsection (b) of Rule 10b-5." *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 503 (S.D.N.Y. 2005). Indeed, "to permit scheme liability 'to attach to individuals who did no more than facilitate preparation of material misrepresentations or omissions actually communicated by others . . . would swallow' the bright-line test between primary and secondary liability." *SEC v. Kelly*, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011) (omission in original) (quoting *SEC v. Pimco Advisors Fund Mgmt. LLC*, 341 F. Supp. 2d 454, 467 (S.D.N.Y. 2004)).[6]

---

[6] In their post-briefing submissions, Plaintiffs rely on a recent decision by the D.C. Circuit finding that a defendant who did not "make" statements under *Janus* was nonetheless sufficiently alleged to be liable under Rule 10b-5(a) and (c) when he emailed the misleading statements directly to investors. *Lorenzo v. SEC*, 872 F.3d 578, 589-91 (D.C. Cir. 2017).

Here, the scheme in which Hughes is alleged to have participated can be described as a plot to publicly misrepresent the source of Arista's capital infusion. Hughes is alleged to have machinated the plan together with Schmitz and Kolokouris, to have offered and sold private Kolokouris family stock holdings to his friends and other acquaintances, to have authored a false revision of the August 30, 2012 board meeting minutes, and to have drafted the false and misleading credit facility, warrant, and note. None of these allegations, however, would operate to mislead or defraud investors in the absence of the statements in the Company's public filings. The private sale of the "founders" shares by itself is not alleged to have been fraudulent in any way. The resulting fraud, rather, was a product of the public representations that the funding obtained from the founders shares sales was in fact the proceeds of a third-party loan. Therefore, Plaintiffs' allegations fall short of pleading that the contrivance to raise capital via private sales was itself "inherently deceptive." *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011); *see id.* (dismissing claims of scheme liability under Rule 10b-5(a) and (c) when the alleged transactions were deceptive "only because of [defendant's] subsequent public misrepresentations"); *cf. SEC v. U.S. Envtl., Inc.*, 155 F.3d 107, 112 (2d Cir. 1998) (holding that trader could be held liable for scheme involving execution of manipulative stock trades); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1471-72 (2d Cir. 1996) (affirming scheme liability where defendant defrauded customers into paying prices that included excessive markups); *SEC v. Lee*, 720 F. Supp. 2d 305, 334 (S.D.N.Y. 2010) (finding sufficiently

However, as Judge Kavanaugh noted in his dissent in that case, and as this Court has just explained, the *Lorenzo* majority's opinion is in direct conflict with the Second Circuit's holding in *Lentell*. *See id.* at 600-01 (Kavanaugh, J., dissenting). Even if *Lorenzo* controlled the Court's analysis here, it is inapposite. The *Lorenzo* majority found the defendant liable under Rule 10-b5(a) and (c) because, unlike the defendant in *Janus*, Lorenzo's role was disclosed to the investing public at the time the statements were disseminated and he "effectively vouched for the [statements] and put his reputation on the line by listing his personal phone number and inviting the investor recipients to 'call with any questions.'" *Id.* at 590. The facts alleged here in no way suggest that Hughes's actions were disclosed to the public at the time of the SEC filings, or that Hughes otherwise placed his reputation on the line and exposed himself to blame for any deceptive acts. To the contrary, it was Schmitz, along with other officers and directors of Arista, who signed the public filings, and there is no allegation that the filings were in some way publicly attributed, or even linked, to Hughes. Thus, even under *Lorenzo*, Plaintiffs have failed to state a claim for scheme liability against Hughes.

alleged scheme liability when it was premised on "u-turning" commodity prices between brokerage houses).

Plaintiffs' allegations regarding Hughes's "scrubbing" of the board meeting minutes at first blush fare slightly better. Taken as true, such extensive revision of the minutes may be described as "inherently deceptive." However, as Hughes rightly argues, the Supreme Court requires more than pleading a scheme; it requires that a plaintiff also plead reliance on the deceptive acts in the plaintiff's decision to purchase or sell securities. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 159-60 (2008). Plaintiffs plead that they relied on the publicly filed statements, but allege nothing even suggesting that they relied on board meeting minutes when they elected to purchase Arista stock in 2014. Accordingly, Plaintiffs fail to state a claim for scheme liability premised on Hughes's doctoring of those Arista records.

Moreover, to the extent that Plaintiffs attempt to allege that Hughes created TMK-ENT for the purpose of hiding Kolokouris's funding of Arista, separate and apart from the concealment worked by the public statements themselves, that attempt fails. Hughes is alleged to have prepared the legal paperwork for the creation of TMK-ENT in February 2011, eighteen months before Arista even determined that it needed to raise capital through private sales of the founders shares. There is no allegation that Kolokouris intended to fund Arista prior to the August 2012 board meeting, nor that Arista intended to seek any monies from Kolokouris which would need to be funneled through a separate entity before that time.

In sum, the amended complaint insufficiently pleads Hughes's liability as a primary violator of Rule 10b-5, and Plaintiffs' Section 10(b) claims against him are dismissed in their entirety.

## 2. Claims Against Saba and Matthews

### a. Plaintiffs' Reliance on Misstatements

Saba and Matthews identify various claimed deficiencies in the amended complaint's

allegations in connection with the Section 10(b) claims against them. Among other arguments, Saba and Matthews assert that Plaintiffs cannot, as a matter of law, plead reliance on any statements made by those defendants. Saba and Matthews Mem. in Supp. of Mot. to Dismiss, ECF No. 82 ("S&B Mem.") at 12. This is so, they argue, because the merger clause contained in the parties' SPA precludes reliance on any extra-contractual representations. *Id.* at 12-14.

A plaintiff's reasonable reliance upon an alleged misrepresentation or omission is a necessary element of a Section 10(b) or Rule 10b-5 claim. *Harsco Corp. v. Segui*, 91 F.3d 337, 342 (2d Cir. 1996); *see Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003) ("For plaintiff to prevail on [a Section 10(b) and Rule 10b-5 claim], it has to establish reasonable reliance on the alleged misrepresentations or omissions."); *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir. 1994) (Rule 10b-5 "makes unlawful any misrepresentation that would cause reasonable investors to rely thereon"). "Although reasonable reliance is a fact-specific inquiry generally considered inappropriate for determination on a motion to dismiss, whether a plaintiff has adequately pleaded justifiable reliance can be a proper subject for a motion to dismiss in certain circumstances." *Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 459 (S.D.N.Y. 2007) (citation omitted).

"In assessing the reasonableness of a plaintiff's alleged reliance, [courts] consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Emergent Capital*, 343 F.3d at 195 (citing *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1541-43 (2d Cir. 1997); *Harsco*, 91 F.3d at 345-46). The Second Circuit has found that a merger clause in a contract executed between sophisticated parties may preclude a party to that contract from later claiming reliance on pre-contractual oral representations. *See Emergent Capital*, 343 F.3d at 195-96 (finding that plaintiff, a sophisticated investor, was precluded from asserting reliance on an oral representation that defendant's largest investment was a $14 million purchase of an equity interest in another entity

when the SPA subsequently executed by the parties lacked mention of that investment and included a standard merger clause). Where the parties have executed an agreement containing a merger clause, courts look to "the entire context of the transaction" to determine whether a plaintiff's reliance on an extra-contractual representation is reasonable. *Id.* at 195.

Here, Plaintiffs allege that Saba and Matthews misrepresented the commencement of the Rose/City Lights Project and the barriers to completion of that project in February 2014. Am. Compl. ¶¶ 82-85. The following month, Arista executed the SPA. *Id.* ¶ 86. The SPA details various representations and warranties regarding, *inter alia*, Arista's structure and organization, its authority to enter into the transaction, its adherence to the law, its capitalization, its pending litigation, insurance coverage, its title to assets and valid intellectual property rights, and disclosure warranties. Declaration of Erica Wolff, ECF No. 90 ("Wolff Decl."), Ex. A § 3.1.

Section 3.2 details various representations and warranties of the purchasers of the Arista securities that are made by "[e]ach Purchaser, for itself and for no other Purchaser." *Id.* § 3.2. In Section 3.2(d), Plaintiffs each represented that they possessed "such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of the prospective investment in the Securities, and ha[ve] so evaluated the merits and risks of such investment." *Id.* § 3.2(d). The next clause affirms that:

> Such Purchaser has been furnished with or has had access to the EDGAR Website of the [Securities and Exchange] Commission to the Company's filings made with the Commission during the period from the date that is two years preceding the date hereof through the tenth business day preceding the Initial Closing Date in which such Purchaser purchases Securities hereunder, including but not limited to the Company's amended registration statement on Form S-1 filed with the Commission on October 3, 2013 (hereinafter referred to collectively as the "*Reports*"). Purchasers are not deemed to have any knowledge of any information not included in the Reports unless such information is delivered in the manner described in the next sentence. In addition, such Purchaser may have received in writing from the Company such other information concerning its operations, financial condition and other matters as such Purchaser has requested, identified

25

thereon as OTHER WRITTEN INFORMATION (such other information is collectively, the "*Other Written Information*"). Such Purchaser believes that it has received all the information such Purchaser considers necessary or appropriate for deciding whether to purchase the Securities and considered all factors such Purchaser deems material in deciding on the advisability of investing in the Securities. Such Purchaser was afforded (i) the opportunity to ask such questions as such Purchaser deemed necessary of, and to receive answers from, representatives of the Company concerning the merits and risks of acquiring the Securities; (ii) the right of access to information about the Company and its financial condition, results of operations, business, properties, management and prospects sufficient to enable such Purchaser to evaluate the Securities; and (iii) the opportunity to obtain such additional information that the Company possesses or can acquire without unreasonable effort or expense that is necessary to make an informed investment decision with respect to acquiring the Securities.

*Id.* § 3.2(e).

At Section 5.3, the SPA contains a standard merger clause that provides:

The Transaction Documents, together with the exhibits and schedules thereto, contain the entire agreement of the parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, oral or written, with respect to such matters, which the parties acknowledge have been merged into such documents, exhibits and schedules.

*Id.* § 5.3.

Plaintiffs argue that Defendants' reliance on *Emergent Capital* is misplaced because, unlike in *Emergent Capital*, the SPA at issue here contains no disclosures specifically regarding the subject of the alleged misrepresentation—the Rose/City Lights Project. See Pl.'s Opp. at 19-20. In *Emergent Capital*, the Second Circuit reasoned that the SPA's merger clause precluded the plaintiff's reliance on a pre-SPA statement made by the defendant's executive regarding the total sum of the defendant company's investment in a particular entity because the SPA itself contained "extensive contractual representations concerning [the company's] financial condition and operations." 343 F.3d at 196. Plaintiffs highlight that, under New York law, a merger clause does not preclude a claim for fraud in the inducement where the contract lacks provisions specifically concerning the subject matter of the

alleged fraud. *See, e.g., Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 94 (1985) (noting that "the rule that fraud in the inducement vitiates a contract [is] subject to exception where the person claiming to have been defrauded has by his own *specific* disclaimer of reliance upon oral representations himself been guilty of deliberately misrepresenting [his] true intention" (second alteration in original) (emphasis added) (internal quotation marks and citation omitted)); *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 320 (1959) (confirming the "fundamental principle that a general merger clause is ineffective to exclude parol evidence to show fraud in inducing the contract" but holding that a "specific disclaimer destroys the allegations in plaintiff's complaint that the agreement was executed in reliance upon [ ] contrary oral representations"); *see also Mfrs. Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir. 1993) (citing *Plapinger* and *Danann* and stating that when "the contract states that a contracting party disclaims the existence of or reliance upon specified representations, that party will not be allowed to claim that he was defrauded into entering the contract in reliance on those representations").

Plaintiffs' recital of the law is grounded in sound legal principles, but Plaintiffs' argument ignores Section 3.2(e) of the SPA. That section incorporates into the bank of knowledge that Plaintiffs warrant to have possessed at the time of the SPA any information contained in certain SEC filings, and in particular the information contained in Arista's October 3, 2013 S-1 filing. Wolff Decl., Ex. A § 3.2(e). The October 3, 2013 S-1 provides detailed representations concerning the Rose/City Lights Project, indicating that Arista "entered into an Agreement with City Lights at Queens Landing, Inc. pursuant to which City Lights has agreed to purchase a Power on Demand system for installation and use at City Lights' 43-story, 525-unit cooperative building located in Long Island City, New York." Declaration of Mary Shepard, ECF No. 99 ("Shepard Decl."), Ex. 15 at 33. The S-1 goes on to explain further details of the project, indicating that "City Lights *intends* to purchase and have installed a combined heating and power co-generation system at the City Lights

Building." *Id.* (emphasis added). The S-1's description of the project concludes with a statement that Arista "expect[s] the Power on Demand System to be installed by the fourth quarter of 2013." *Id.* Other 2013 public filings also contain detailed representations concerning the Rose/City Lights Project. The earlier August 13, 2013 Form 10-Q explains the project in nearly identical terms. *See* Wolff Decl., Ex. F at 15. The November 12, 2013 Form 10-Q describes the project similarly, still using the forward-looking statement that City Lights "intends" to purchase and install the POD system, and noting an expectation-of-completion date in the first quarter of 2014. Wolff Decl., Ex. G at 15. Thus, by the SPA's plain terms, Plaintiffs agreed that they were furnished with and deemed to have knowledge of specific information related to the Rose/City Lights Project, and in particular, information related to the *anticipated* purchase and installation of the POD system and the expected completion dates.

Section 3.2 truly pulls the plug on Plaintiffs' argument, though, with its express disclaimer of reliance on any information not provided in writing. In the second sentence of Section 3.2(e), Plaintiffs acknowledge that they "are not deemed to have any knowledge of any information not included in the [SEC filings] unless such information is delivered in the manner described in the next sentence." Wolff Decl., Ex. A § 3.2(e). That next sentence specifies that such additional information may be received by Plaintiffs "in writing." *Id.*

Far from resembling the boiler-plate disclaimers that do not preclude reliance, the SPA's terms are more robust than those in the contract at issue in *Emergent Capital*, and the Second Circuit's decision is on point. *See Emergent Capital*, 343 F.3d at 196. By Plaintiffs' own acknowledgment, Plaintiffs are sophisticated and experienced in financial and business matters. As such, and like the investors in *Emergent Capital*, Plaintiffs should have protected themselves by insisting that the SPA include Saba and Matthews' representations—that, (1) despite the language in the SEC filings suggesting that City Lights had not yet purchased the POD system, the Rose/City Lights Project

was already underway, and (2) despite the already postponed expected completion dates, the only hurdle to completion was the $1.5 million funding. *See Emergent Capital*, 343 F.3d at 196.

Plaintiffs' express warranties and disclaimer of reliance on any oral representations coupled with their self-proclaimed sophistication "precludes as a matter of law a finding of reasonable reliance upon" Saba and Matthews' alleged misrepresentations about the Rose/City Lights Project. *Id.*; *see Harsco*, 91 F.3d at 346 (holding, in light of fourteen pages of representations and warranties: "We think Harsco should be treated as if it meant what it said when it agreed in Section 2.05 that there were no representations other than those contained in Sections 2.01 through 2.04 that were part of the transaction. Here, as in our analysis of § 29(a) of the Exchange Act, a less detailed Section 2.04 might lead to a different result. But the exhaustive nature of the Section 2.04 representations adds to the specificity of Section 2.05's disclaimer of other representations."); *Dresner v. Utility.com, Inc.*, 371 F. Supp. 2d 476, 492-93 (S.D.N.Y. 2005) (finding that plaintiffs "failed to proffer facts suggesting it would have been reasonable for them to rely on representations made in advance of" the parties' written agreement where the agreement contained a "clear" merger clause, the parties were sophisticated with a "relative parity of bargaining power," the agreement contained a "litany of representations and warranties," and the agreement contained "cautionary language" qualifying any pre-agreement statements); *Consolidated Edison, Inc. v. Ne. Utilities*, 249 F. Supp. 2d 387, 403 (S.D.N.Y. 2003) ("Like *Harsco*, the Confidentiality Agreement's disclaimer, as well as the integration clause in the Merger Agreement, are strengthened by the extensive and exclusive representations and warranties made in the Merger Agreement which failed to include the representations on which Con Edison now seeks to rely."), *rev'd in part on other grounds*, 426 F.3d 524 (2d Cir. 2005).

Plaintiffs may state a claim for a primary violation of the Exchange Act only if they sufficiently plead reliance. *See GAMCO*, 838 F.3d at 217. Accordingly, because Plaintiffs are

precluded as a matter of law from claiming reliance on the oral statements, Plaintiffs' claims against Saba and Matthews premised on their affirmative misrepresentations are dismissed with prejudice.

### b. Saba and Matthews' Alleged Omission

In addition to the misstatements described above, the amended complaint alleges that Saba and Matthews "failed to disclose to Plaintiffs the existence of an ongoing SEC investigation of the Company." Am. Compl. ¶ 88. While the SPA precludes Plaintiffs' reasonable reliance on affirmative statements by these defendants, it does not preclude claims based on omissions. *See Emergent Capital*, 343 F.3d at 196 (explaining that, with respect to an allegation of an omission, the plaintiff "had no notice of the omitted facts and could not have protected itself by insisting on corresponding contractual representations"). Therefore, Plaintiffs' claim regarding the omitted fact of the ongoing SEC investigation may go forward, provided that Plaintiffs sufficiently plead each of the required elements as to that claim. This, however, they fail to do.

As a threshold matter, Plaintiffs fail to plead that Saba and Matthews owed them a duty to disclose the pending investigation. *See Chiarella*, 445 U.S. at 235 ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak."). Assuming for purposes of this motion that Saba and Matthews were sufficiently alleged to have owed such a duty, Plaintiffs nonetheless fail to allege the remaining required elements of their claim.

"It is long settled that a securities-fraud plaintiff 'must prove both transaction and loss causation.'" *Lentell*, 396 F.3d at 172 (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994)); *accord Weiss v. Wittcoff*, 966 F.2d 109, 111 (2d Cir. 1992). To plead transaction causation, a plaintiff must plead simply that "but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." *Emergent Capital*, 373 F.3d at 197.

"Loss causation" in the context of a private securities fraud action refers to a "causal

connection between the material misrepresentation and the loss." *Dura Pharms, Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (citing 15 U.S.C. § 78u-4(b)(4)); *see Lentell*, 396 F.3d at 172. A plaintiff is required to plead "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms.*, 544 U.S. at 347; *accord Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (burden of pleading loss causation is "not a heavy one" and complaint "must simply give Defendants 'some indication' of the actual loss suffered and of a plausible causal link between the loss and the alleged misrepresentations" (quoting *Dura Pharms.*, 544 U.S. at 347)).

"To plead loss causation, plaintiffs must allege 'that the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'" *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014) (quoting *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)). That is, plaintiffs must allege "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell*, 396 F.3d at 173.

Here, Plaintiffs sufficiently allege transaction causation with respect to the omission by Saba and Matthews. They allege that "[h]ad Plaintiffs been aware of the SEC investigation of Arista and its officers, it would not have purchased Arista securities." Am. Compl. ¶ 88. The amended complaint lacks, however, any allegation that this omission was the cause of Plaintiffs' losses. The scant allegations regarding loss causation assert that Saba and Matthews' statements and omissions "with respect to Arista's business operations (or lack thereof), its ability (or lack thereof) to obtain financing, and the integrity (or lack thereof) of Arista's management concealed the risk of Arista's bankruptcy," thus leading to Plaintiffs' losses. *Id.* ¶ 99. Nowhere in the amended complaint do Plaintiffs plead that Saba and Matthews' failure to advise them of the pending SEC investigation concealed the risk of the 2016 bankruptcy. Therefore, any claim against Saba and Matthew premised

on this omission is dismissed.

### 3. Claims Against Schwell and Schmitz

Schwell and Schmitz apparently concede that the amended complaint sufficiently alleges that they made material misstatements or omissions in connection with Plaintiffs' purchase of Arista securities, and that those statements or omissions were made with the requisite scienter. These defendants attack only the amended complaint's allegations of loss causation.

Securities-fraud plaintiffs may plead loss causation "*either* by alleging (a) 'the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud;' or (b) that 'that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *Barclays*, 750 F.3d at 232 (citing *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010) (internal quotation marks omitted)); *see also Lentell*, 396 F.3d at 175 n.4. In this case, Plaintiffs pursue the risk materialization theory. *See* Pl.'s Opp. at 29.

Under a risk materialization theory, a misstatement or omission is "the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations.'" *In re Omnicom Grp.*, 597 F.3d at 513 (quoting *Lentell*, 396 F.3d at 173). "The zone of risk is determined by the purposes of the securities laws, *i.e.*, 'to make sure that buyers of securities get what they think they are getting.'" *Id.* (quoting *Chem. Bank v. Arther Andersen & Co.*, 726 F.2d 930, 943 (2d Cir. 1984)). Put another way, a plaintiff's loss must be both a "foreseeable" consequence of the alleged misstatements and omissions, as well as the result of "the materialization of the concealed risk." *Lentell*, 396 F.3d at 173. Therefore, to state a claim under a risk materialization theory, a plaintiff must allege facts to show that the defendant's false statements and omissions concealed the risk that materialized and played "some part in diminishing the market value" of the securities. *Id.* at 176-77. Of particular relevance to the arguments raised in this case,

> where . . . substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to

> conceal the very same risk, a plaintiff must allege (i) facts sufficient to support an inference that it was defendant's fraud—rather than other salient factors—that proximately caused plaintiff's loss; or (ii) facts sufficient to apportion the losses between the disclosed and concealed portions of the risk that ultimately destroyed an investment.

*Id.* at 177.

The risk that Plaintiffs allege was concealed here by Defendants' misrepresentations is the risk of Arista's bankruptcy. Am Compl. ¶¶ 98-99. Specifically, as the Court has explained, Plaintiffs allege that Defendants' fraudulent statements and omissions with respect to (1) "Arista's business operations (or lack thereof)," (2) Arista's "ability (or lack thereof) to obtain financing," and (3) "the integrity (or lack thereof) of Arista's management concealed the risk of Arista's bankruptcy, and thus caused Plaintiffs' losses when Arista filed for bankruptcy and its stock price plummeted to nearly zero." *Id.* ¶ 99.[7]

Schmitz and Schwell argue that Arista's public filings facially contained substantial indicia of the Company's risk of insolvency and that the amended complaint fails to allege facts sufficient to support an inference that those Defendants' purported fraud, and not other factors, proximately led to the bankruptcy. Defendants also argue that the amended complaint fails, in the alternative, to allege facts sufficient to apportion the losses between the disclosed and concealed portions of the risk of bankruptcy.

The Court agrees. Not only do the SEC filings containing the allegedly fraudulent statement by Schmitz and Schwell shed light on the Company's bleak financial condition, but they contain substantial indicia of the risk of bankruptcy. In the Company's Form 10-K filed on March 28, 2013, one of the alleged false and misleading SEC filings signed by both Schmitz and Schwell, Arista

---

[7] It is unclear from the amended complaint that the reference to statements concerning the Company's "business operations (or lack thereof)" is with respect to statements by Schmitz and Schwell. Rather, this appears to be a reference to the allegedly false statements by Saba and Matthews that the Rose/City Lights Project was already underway.

33

warned that:

> Recurring losses from operations raise substantial doubt about our ability to continue as a going concern. The presence of the going concern explanatory paragraph may have an adverse impact on the relationships we are developing and plan to develop with third parties as we continue the commercialization of our products and could make it challenging and difficult for us to raise additional financing, all of which could have a material adverse impact on our business and prospects and result in a significant or complete loss of your investment.

Wolff Decl., Ex. C at 14. In another of the alleged false and misleading filings—Arista's Form S-1 filed on October 3, 2013 signed by Schmitz—the Company alerted the public that Arista had "incurred significant losses in prior periods, and losses in the future could cause the trading price of our stock to decline or have a material adverse effect on our financial condition, our ability to pay our debts as they become due and on our cash flows." Wolff Decl., Ex. E at 6. These statements are supported by financial data disclosed in the filings, showing that the total stockholders' equity ("TSE") declined from $301,869 at year-end in 2012 to a deficit of $571,126 at year-end of 2013. *Id.* at F-2. The grim statements and raw data are substantial indicia of the risk of Arista's bankruptcy. *See Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007) (finding that financial statements showing significant declines in TSE and expressing concern about company's ability to continue as a growing concern provided "substantial indicia of the risk" of the company's bankruptcy).

Plaintiffs argue that *Lattanzio* is distinguishable in that, unlike the company in that case, Arista purposefully misrepresented and concealed material facts regarding its source of financing, which made its actual financial condition "*less* apparent." Pl.'s Opp. at 30-31. This argument is unavailing. Even taking the above statements as insufficient indicia of the risk of Arista's bankruptcy, any risk that remained concealed was drawn out of the shadows and placed in the spotlight by statements in other portions of those documents. In the March 28, 2013 10-K, Arista

spelled out the risk in unambiguous terms:

> Our ability to develop our business could suffer if we are unable to raise additional funds on acceptable terms, which would have the effect of limiting our ability to increase our revenues, develop our products, attain profitable operations, *or even may result in our business filing for bankruptcy protection* or otherwise ending our operations which could result in a significant or complete loss of your investment.

Wolff Decl., Ex. C at 14. The same unambiguous warning of the possibility of bankruptcy was expressed in the October 3, 2013 S-1. *See* Wolff Decl., Ex. E. at 7.

In light of these substantial indicia, indeed express acknowledgements, of the risk of Arista's bankruptcy, Plaintiffs were required to either plead facts sufficient to support an inference that the 2016 bankruptcy was caused by the alleged misstatements and omissions rather than by "other salient factors" or facts to support an apportionment of the disclosed and concealed portions of the risk of bankruptcy. The amended complaint does neither. In the absence of such allegations, Plaintiffs are unable to plead loss causation, even under the more forgiving notice pleading standard, and their Section 10(b) claims against Schmitz and Schwell are dismissed.

### B. Claims Under Section 20(a) of the Exchange Act

In addition to claims for primary liability under Section 10(b) and Rule 10b-5, Plaintiffs allege that Schwell, Hughes, Schmitz, and SWA are secondarily liable under Section 20(a). Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). "Any claim for 'control person' liability under § 20(a) of the Exchange Act must be predicated on a primary violation of securities law." *Pacific Inv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144, 160 (2d Cir. 2010). "To state a claim of control person liability under § 20(a), 'a plaintiff

must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'" *Barclays*, 750 F.3d at 236 (quoting *ATSI*, 493 F.3d at 108).

Plaintiffs' Section 20(a) claims fail necessarily because, for the reasons explained herein, the amended complaint does not state a claim for a primary violation. That failure is by itself dispositive. However, in light of this Circuit's practice of granting a plaintiff leave to replead, and to ensure a more efficient disposition of Plaintiffs' claims as the litigation moves forward, the Court addresses certain aspects of Defendants' arguments in connection with Plaintiffs' Section 20(a) claims.

First, the Individual Defendants argue that the amended complaint insufficiently alleges that Hughes and Schwell actually controlled a primary violator in connection with the alleged misstatements and omissions. As a basic matter, it is settled that "a party may not ultimately be held liable under both Section 10(b) and Section 20(a) for the same underlying conduct." *In re Alstom SA Sec. Litig.*, 454 F. Supp. 2d 187, 210-11 (S.D.N.Y. 2006). Therefore, to the extent that either Hughes or Schwell were sufficiently alleged to be primary violators, they cannot also be secondarily liable as to the statements for which they are primarily liable. While Plaintiffs allege control-person liability as to Schmitz, in his capacity as Arista's CEO, and Schwell, in his capacity as the chairman of Arista's board, it is not at all apparent from the face of the pleadings that either one of those exercised actual control over the other in connection with the other's statements at issue in this case. Nor do Plaintiffs' allegations support a showing of control over Schmitz or Schwell by Hughes.

The Court is mindful of the fact that determining whether an individual defendant is a "controlling person" is "a fact-intensive inquiry that generally should not be resolved on a motion to dismiss." *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 741 (S.D.N.Y. 2015) (citation and alteration omitted). Nonetheless, "it is not sufficient for [a plaintiff] to allege that [a defendant] has

control person *status*; instead, [the plaintiff] must assert that [the defendant] exercised *actual* control over the matters at issue." *In re Smith Barney*, 884 F. Supp. 2d at 166; *see also In re Global Crossing, Ltd. Sec. Litig.*, No. 02-cv-910, 2005 WL 1907005, at *12 (S.D.N.Y. Aug. 8, 2005) (Lynch, J.) ("To be liable as a control person, the defendant must actually possess, in fact, rather than in theory, the ability to direct the actions of the controlled person." (citation omitted)). "Neither director status nor mere membership on an audit committee, standing alone, is sufficient to demonstrate actual control over a company or an allegedly fraudulent transaction." *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 720-21 (S.D.N.Y. 2013) (citation omitted).

Second, and more problematic in the Court's view, is the alleged secondary liability of SWA. In their opposition, Plaintiffs argue that SWA is liable under a theory of vicarious liability for Hughes and Schwell's fraudulent statements and omissions. Pl.'s Opp. at 42. In the same breath, Plaintiffs posit that the misconduct of Hughes and Schwell may be "imputed" to the firm. *Id.* at 43. As an initial matter, Plaintiffs fail to appreciate that vicarious liability under a theory of *respondeat superior* does not involve an "imputation" of misconduct. Rather, the doctrine of *respondeat superior* is founded in traditional principles of agency, whereby the principal may be liable for the malfeasance of its agent. *See In re Parmalat Secs. Litig.*, 594 F. Supp. 2d 444, 450 (S.D.N.Y. 2009) ("At the most basic level, the common law principle of *respondeat superior*—i.e., that a principal is liable for the acts of its agent within the scope of the agent's authority—is centuries old."); *see also* Restatement (Second) of Agency §§ 228, 229, 257, 258, 261, 262, 265.

More importantly, in the context of a Section 20(a) claim, *respondeat superior* does not provide an alternative method of pleading secondary liability under the Exchange Act. Rather, to the extent a plaintiff may bring a securities fraud claim on the theory of *respondeat superior*, such a claim lies under common law, and not the Exchange Act. *See Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 716 (2d Cir. 1980) (noting that "Section 28(a), 15 U.S.C. § 78bb, specifically enacts that the rights and

remedies provided by the '34 Act shall be *in addition to* any and all rights and remedies that may exist at law or equity, and Section 16 of the '33 Act, 15 U.S.C. § 77p, similarly provides that the rights and remedies of the '33 Act are *additional to* pre-existing remedies." (emphasis added)).

Relying on case law that has held that an attorney's knowledge may be imputed to the law firm with which the attorney is associated, Plaintiffs appear to mistake the imputation of knowledge for purposes of pleading scienter under Section 10(b) as an imputation of liability under Section 20(a). Plaintiffs rely heavily on, for example, *In re Rospatch Securities Litigation*, in which the Western District of Michigan observed that "[o]ther courts have found that a senior partner's participation in misrepresentations and omissions may be imputed to the law firm." 760 F. Supp. 1239, 1250 (W.D. Mich. 1991). The *Rospatch* court, in turn, cites to a decision from this district, *Griffin v. McNiff*, 744 F. Supp. 1237 (S.D.N.Y. 1990). *Id.* In *Griffin*, the plaintiff brought claims for primary violations of the Exchange Act against an attorney and the law firm of which the attorney was a senior partner. 744 F. Supp. at 1247. The plaintiff alleged that the law firm itself was involved in preparing the private placement memoranda and tax opinions containing the misstatements and omissions. *Id.* In evaluating the sufficiency of the complaint's allegations of scienter, the *Griffin* court found that the complaint gave rise to a strong inference of scienter on the part of the law firm because the attorney, who was alleged to personally know of the fraud, was a senior partner of the firm. *Id.* Thus, the court concluded that the attorney's knowledge of the fraud could be imputed to the firm. *Id.*; *see Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001) (noting that "[a] corporation can only act through its employees and agents" and explaining that "an allegation that a particular agent may have doctored or conveyed the report will not immunize the principals from liability for a knowing deception").

Even where courts in this district have turned to agency principles in finding secondary liability under Section 20(a), they have done so to determine whether allegations satisfy the specific

elements of a control-person liability claim. In *CompuDyne Corp. v. Shane*, another case relied upon by Plaintiffs, the court found that "the well pled facts in the [First Amended Complaint] allege that at all times [the employee] was acting within the scope of her employment *and that [the principal] participated in the scheme.*" 453 F. Supp. 2d 807, 831 (S.D.N.Y. 2006) (emphasis added). Judge Sweet's discussion of the agency relationship between the company and the employee can best be understood as an evaluation of the *control* exerted over the employee by the defendant company— the second prong of a Section 20(a) claim. Judge Sweet ultimately found, however, that the employer was also sufficiently pleaded to have been a culpable participant—in satisfaction of the third prong of a Section 20(a) claim. *See id.* Therefore, the Court does not read *CompuDyne* to support the notion that *respondeat superior* liability is an alternative gateway to secondary liability under the Exchange Act.

The theory advanced by Plaintiffs, that an employer may be liable under Section 20(a) solely on the grounds of *respondeat superior*, would render pointless the requirement of culpable participation. It would also open the door to substantial liability by employers who may play no role in the fraud perpetrated by their employees, liability that is beyond the scope of that expressly provided for by the Exchange Act. As the Second Circuit has highlighted, "[w]here respondeat superior principles are applied, the special good faith defense afforded by the last clause of Section 20(a) is unavailable." *Marbury Mgmt.*, 629 F.2d at 716; *see* 15 U.S.C. § 78t(a). Because good faith is not an available defense to *respondeat superior* liability claims, Plaintiffs' theory would grossly expand liability to include conduct beyond that proscribed by the clear language of the Exchange Act.

Plaintiffs' theory of "imputation" would also expose corporate entities to liability for the fraudulent acts of their officers, even where those officers have acted fraudulently in their capacity as something other than the officer of that entity. Plaintiffs essentially argue that here, Schwell, as managing partner of SWA, may bind SWA's hands under Section 20(a), despite the allegations that

Schwell made the allegedly fraudulent statements in his capacity as Arista's chairman of the board, and not in his capacity as counsel or as an agent of SWA. Such a theory of secondary liability would permit Plaintiffs to plead securities-fraud liability against any company with which Schwell happened to be associated. This, however, is unsupported by the case law. *See in re Alstom, S.A.*, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005) ("[T]he Section 20(a) defendant must not only have actual control over the primary violator, but have actual control over the *transaction* in question." (internal quotation marks and citation omitted)); *Kalin v. Xanboo*, 526 F. Supp. 2d 392, 403 (S.D.N.Y. 2007) ("A person can hold positions as a corporate officer, stockholder, and director of two companies, and yet can be acting in only one of those two roles at a given moment.").

### C. Common-Law Fraud Claim

Plaintiffs bring claims for common-law fraud against Schmitz, Hughes, Saba, and Matthews, claims which each of those defendants have moved to dismiss. To state a claim for common-law fraud under New York law, "a plaintiff must show a material representation or omission of fact, made with knowledge of its falsity, with scienter or an intent to defraud, upon which the plaintiff reasonably relied, and that such reliance caused damage to the plaintiff." *In re Tremont Secs. Law, State Law and Ins. Litig.*, 703 F. Supp. 2d 362, 371 (S.D.N.Y. 2010) (citing *May Dep't Stores Co. v. Int'l Leasing Corp.*, 1 F.3d 138, 141 (2d Cir. 1993)). Courts in this Circuit have found that the elements of common law fraud under New York law are "essentially the same" as those required to be pleaded under Section 10(b) of the Exchange Act and Rule 10b-5. *See Levy v. Maggiore*, 48 F. Supp. 3d 428, 462 (E.D.N.Y. 2014) (collecting cases); *Fezzani v. Bear, Stearns & Co.*, 592 F. Supp. 2d 410, 423 (S.D.N.Y. 2008); *Tremont Secs. Law*, 703 F. Supp. 2d at 372 (holding that, because plaintiffs' Section 10(b) claim did not survive dismissal, plaintiffs' common-law claim for fraud based on the same allegations of fact "must be dismissed as well").

Because Plaintiffs are precluded as a matter of law from relying on the oral representations

by Saba and Matthews, any claim for common-law fraud based on those affirmative statements is dismissed with prejudice. For the reasons described above with respect to the Section 10(b) claims, Plaintiffs' common-law-fraud claim against those Defendants is dismissed without prejudice to the extent that the claim is premised on Saba and Matthews' omission in connection with the SEC investigation.

Plaintiffs' claim for common-law fraud against Schmitz is also dismissed, as, for the reasons explained earlier, Plaintiffs fail to plead loss causation. The Court also finds that the amended complaint fails to plead loss causation as to Hughes for the same reasons identified in Section III.A.3. The statements and omissions that are alleged to have been made by Hughes are contained in the same SEC filings signed by Schmitz and Schwell. Because those filings contained substantial indicia of the risk that they are alleged to have concealed, Plaintiffs' allegations with respect to the risk concealed by statements made by Hughes are inadequate. According, the common-law-fraud claim against Hughes is dismissed.

## IV.    CONCLUSION

For the reasons stated herein, Defendants' motions to dismiss the amended complaint are GRANTED.

Plaintiffs' Section 10(b) claims against Hughes, Schmitz, and Schwell are dismissed without prejudice.

Plaintiffs' Section 10(b) claims against Saba and Matthews are dismissed with prejudice to the extent they are premised on affirmative oral misstatements by those defendants. Plaintiffs' Section 10(b) claims against Saba and Matthews in connection with the omissions related to the SEC investigation are dismissed without prejudice.

Plaintiffs' Section 20(a) claims are dismissed without prejudice.

Plaintiffs' common-law-fraud claims against Hughes and Schmitz are dismissed without

prejudice. Plaintiffs' common-law-fraud claims against Saba and Matthews are dismissed with prejudice to the extent they are premised on affirmative oral misstatements by those defendants. Plaintiffs' common-law-fraud claims against Saba and Matthews in connection with the omissions related to the SEC investigation are dismissed without prejudice.

Plaintiffs are granted leave to replead those claims that have been dismissed without prejudice no later than thirty (30) days following the date of this order. *See Rutolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (noting that leave to amend is "liberally granted").

The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 81, 88, 92, 97, and 100.

SO ORDERED.

Dated: March 30, 2018
New York, New York

_____
GREGORY H. WOODS
United States District Judge