UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

ALPHA CAPITAL ANSTALT and ELLIS : 
INTERNATIONAL, LTD., :
:
:
Plaintiffs, :
:
-v- :
:
SCHWELL WIMPFHEIMER & ASSOCIATES :
LLP, DOV SCHWELL, MICHAEL HUGHES, :
WILLIAM SCHMITZ, ADEEB SABA, and :
MARK MATTHEWS, :
:
Defendants. :

-------------------------------------------------------------- X

1:17-cv-1235-GHW

<u>MEMORANDUM OPINION AND
ORDER</u>

**GREGORY H. WOODS**, United States District Judge:

## I. INTRODUCTION

The plaintiffs in this case purchased close to $1 million worth of common stock in Arista Power, a New York startup in the business of developing and selling wind turbines. Their investment was made in a company known to be in trouble—with "going concern" qualifications and a negative balance sheet. Less than two years after the plaintiffs invested, Arista filed for bankruptcy. The plaintiffs then filed this suit, asserting that their losses resulted from Arista's fraudulent misrepresentations regarding the source of its funding. Because the plaintiffs fail to plead loss causation, as required to state a claim for the primary violation of the Securities Exchange Act that they assert, the entirety of their claims fail as pleaded. Accordingly, the defendants' motions to dismiss are GRANTED.

## II. BACKGROUND[1]

The Court assumes the reader's familiarity with the background of this case. The Court set

---

[1] Unless otherwise noted, the facts are taken from the second amended complaint and are accepted as true for the purposes of this motion. *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

forth the facts, as presented by the plaintiffs, in a previous opinion, *see Alpha Capital Anstalt v. Schwell Wimpfheimer & Assocs. LLP*, No. 1:17-CV-1235-GHW, 2018 WL 1627266, at *1 (S.D.N.Y. Mar. 30, 2018) and it incorporates the background set forth in that opinion here. Below, the Court sketches an overview of the facts giving rise to this case, with an emphasis on the events and parties relevant to instant motion.

### A. Underlying Events Giving Rise to the Case

On March 31, 2014, Alpha Capital Anstalt ("Alpha") and Ellis International, Ltd. ("Ellis") (collectively, "Plaintiffs") invested $ 955,000 in Arista Power ("Arista" or "the Company"), a company that purported to develop and sell wind turbines, pursuant to a securities purchase agreement. SAC at ¶¶ 11, 15. By their own acknowledgment, Plaintiffs are sophisticated and experienced in financial and business matters. Dkt. No. 122 at 28.

At all times relevant to the issues raised in this case, defendant William Schmitz served as Arista's chief executive officer ("CEO") and was a member of the company's board of directors. *Id* at ¶ 7. During this time period, defendant Dov Schwell also served as the chairman of Arista's board of directors and as a member of the board's audit committee. *Id.* at ¶ 6.

In 1989, the Securities Exchange Commission ("SEC") charged non-party Peter Kolokouris with securities fraud. *Id.* at ¶ 18. Kolokouris settled his charges with the SEC; as part of that settlement, he agreed to an injunction prohibiting him from serving as an officer or director or owning fifty percent or more of the securities of a public company. In July of 2008, Arista retained Kolokouris as a consultant. *Id.* at ¶ 20. On July 10, 2008, Kolokouris entered into a handwritten "Option Agreement" with Arista, which granted him options to purchase 166,000 shares of the Company's stock—over fifteen percent of the Company's outstanding stock—at an exercise price of $1.00 per share. *Id.* at ¶ 20. In March 2009, the Company disclosed that Kolokouris had served as a consultant since July 2008. *Id.* at ¶ 24.

In February 2011, Kolokouris arranged for Michael Hughes, a lawyer and chief legal officer of Schwell Wimpfheimer & Associates ("SWA") to create TMK-ENT, Inc., an entity nominally owned and directed by Kolokouris's neighbor. *Id.* at ¶ 38.

Beginning in the summer of 2012, Arista faced difficulty raising capital for its operations. *Id.* at ¶ 28. As a result, Schmitz, working with Kolokouris, recommended that Arista raise short-term capital through private sales of the stock options that had been transferred to entities owned by Kolokouris' family members. *Id.* To effectuate the sales, Schmitz, along with other Arista affiliates, privately offered Kolokouris family stock to their acquaintances, friends, family members, and others. *Id.* ¶¶ 30, 46. Kolokouris directed Schmitz with respect to what stock to sell, the amounts to sell, and the price at which to sell it. *Id.* at ¶ 30.

In the fall of 2012, Schmitz believed that the Company was legally required to disclose the influx of new capital. *Id.* at ¶ 31. Accordingly, on August 30, 2012, Arista's board of directors held a telephonic meeting to discuss the new funding. *Id.* at ¶ 32. Both Schmitz and Schwell attended the meeting. *Id.* The minutes from this meeting reflect that Schmitz "explained that . . . [the Company was] working on a financing plan with other [Arista] investors, who plan to sell a certain number of shares of [Arista's] stock, and will loan the proceeds from those private sales to [Arista]." *Id.* at ¶ 33. In a Form 8-K that Arista published approximately two weeks after the board of directors' meeting, the Company represented that it "entered into a Loan Agreement with TMK-ENT, Inc. (the "Lender") providing for a $500,000 working capital revolving line of credit for [Arista]." (the "TMK Line of Credit"). *Id.* at ¶ 35. Schmitz signed this 8-K in in his capacity as Arista's CEO. *Id.* at ¶ 36.

TMK-ENT, Inc. never loaned Arista the $500,000 and Schwell and Schmitz understood that Arista was to receive those funds through sales of the Kolokouris family stock. *Id.* at ¶ 39; *see also id.* at ¶¶ 40-42. Furthermore, despite the document's representations, as of the time of the September 2012 8-K filing, neither Arista nor TMK-ENT, Inc. had executed the purported Loan Agreement,

Warrant Purchase Agreement, or Note. *Id.* at ¶ 42. Hughes and Schmitz knew that no such

documents existed at that time. *Id.* It was not until September 26, 2012 that Hughes emailed a draft

of the "TMK-ENT Credit Facility" to Schwell. *Id.* at ¶ 45. In that email, Hughes explained that he

was attaching the credit facility and related note and warrant, and that the facility was "very company

friendly, with just a few real terms (barely) to make it arms-length." *Id.*

In its investigation, the SEC found that the credit facility and related documents were not

finalized until October 2012 at the earliest, after being drafted by Hughes and signed by Schmitz. *Id.*

at ¶¶ 44-45. The SEC, after commencing an investigation into Arista and Kolokouris, also

determined that Hughes and Schmitz had caused the forms to be back-dated to September 4, 2012,

creating the appearance that the final documents had existed at the time of the September 2012 8-K

filing.[2] *Id.* at ¶ 43. Plaintiffs allege that Schmitz understood the loan agreement with TMK-ENT,

Inc. to be a "ginned-up 'agreement'" between Arista and the Kolokouris-controlled entity meant to

"cover up Arista's actual dealings with Kolokouris" rather than an arms' length transaction. *Id.* at ¶

58.

The minutes from the August 2012 board of directors' meeting were not finalized until

October 2012. *Id.* at ¶ 53. On October 22, 2012, the CFO re-sent her August 31, 2012 draft of the

minutes to Hughes, asking him again to review them. *Id.* In a response sent later that day, Hughes

sent the CFO a revised version of the minutes that removed the previously mentioned revenue to be

raised through the sale of Arista investors' stock and, for the first time, mentioned the loan from

TMK-ENT, Inc. *Id.* at ¶¶ 53-54.

Plaintiffs assert that these revised minutes were intended to conceal the actual substance of

the board's August 30, 2012 meeting and to conform it instead to the September 2012 8-K. *Id.* at

---

[2] At some point during 2013, the SEC began investigating Kolokouris and Arista. *Id.* ¶ 14.

¶ 55.  The board, chaired by Schwell, adopted a final version of the minutes on October 24, 2012, after additional changes were made.  *Id.* at ¶ 56.  The final minutes did not reference the sale of Kolokouris family stock.  *Id.*

Over the next two years, the Company continued to make false and misleading statements in its public filings with respect to the purported loan from TMK-ENT, Inc. (the "Misleading SEC Filings").  *Id.* at ¶ 57.  Schmitz, as Arista's CEO, signed each of those public filings.  *Id.* at ¶ 58.  Schwell, as Arista's Chairman of the Board and Director, signed two Form 10-K's.  *Id.* at ¶ 59.  As in their previous complaint, Plaintiffs again allege that, at the time of those filings, Schwell and Schmitz knew or recklessly disregarded that TMK-ENT, Inc. was controlled by Kolokouris and did not have any independent source of funds, that TMK-ENT, Inc. did not transfer any of the funds received by Arista, and that the purported loan was a "fictitious cover" for the Company's raising revenue through sales of the Kolokouris family stock.  *Id.* at ¶ 62.  Plaintiffs also allege that the Misleading SEC Filings painted for the investing public a false and misleading picture that Arista was able to obtain financing from an unrelated third-party lender on an arms' length basis.  *Id.* at ¶ 74.

Arista represented that the amount that it could borrow under the TMK Line of Credit continued to increase.  On September 4, 2012, the Company represented that the credit facility with TMK-ENT, Inc. allowed it to borrow $500,000.  *See* Arista 10-Q for the quarterly period ended September 30, 2013 (the "September 2013 10-Q"), Declaration of Mary Shepard, Dkt. No. 137 ("Shepard Decl."), Ex. 6 at 7.  The Company represents that, on November 13, 2012, the loan agreement was amended to allow it to borrow up to $750,000 and furthermore, that it was amended again on December 12, 2012 to increase the Company's line of credit to $1,250,000.  *Id.*  In its public filings, the Company also described its use of the TMK Line of Credit.  In the September 2013 10-Q, Arista explained that it had already borrowed $1,018,500 from the TMK Line of Credit, that the maturity date for the borrowed funds was December 21, 2014, and that this $1,018,500 and other

financing that it raised in 2012 and 2013 would likely be insufficient to fund its operations and growth in the coming years. *Id.* Additionally, in the Company's 10-K filed March 31, 2014, the Company explained that it did "not expect" to be able to "repay the TMK-ENT credit facility," and that if it was "unable to repay the loan or refinance the loan, this would likely have a material adverse effect on [its] operations, [its] ability to raise capital and the price of [its stock]. *See* Arista 10-K for the fiscal year ended December 31, 2013 (the "December 2013 10-K"), Declaration of Erica A. Wolff, Dkt. No. 135 ("Wolff Decl."), Ex. D at 13.

Beginning in early 2014, Arista began soliciting investments from Plaintiffs. *Id.* at ¶ 66. As explained above, Plaintiffs invested $955,000 in the Company—$800,000 from Alpha and $155,000 from Ellis—pursuant to the securities purchase agreement dated March 31, 2014. *Id.* at ¶ 67. Less than two years later—in January 2016—Arista filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of New York. *Id.* at ¶ 68.

### B. Procedural History

Plaintiffs commenced this action on February 17, 2017. Dkt. No. 1. Plaintiffs named Schwell, Schmitz, SWA, Hughes as well as two Arista employees—Adeeb Saba and Mark Matthews as defendants. Dkt. No. 1 at ¶¶ 6-11. On May 30, 2017, the defendants filed motions to dismiss. Dkt. Nos. 61, 62, 65, 68. Instead of opposing those motions, Plaintiffs filed an amended complaint on June 27, 2017. Dkt. No. 74, Plaintiffs' Amended Complaint (the "FAC"). In the FAC, Plaintiffs asserted three sets of claims. First, Plaintiffs asserted claims under Section 10(b) of the Securities Exchange Act (the "Exchange Act") and Rule 10b-5 promulgated thereunder against Hughes, Schmitz, Saba, and Matthews for allegedly making material misrepresentations and omissions to induce Plaintiffs to purchase Arista securities pursuant to the SPA. *See* FAC at ¶¶ 100-05. Second, Plaintiffs also sought to impose "control person" liability against Schwell, Hughes, SWA, and

Schmitz under Section 20(a) of the Exchange Act. *See id.* at ¶¶ 106-110. Finally, Plaintiffs asserted claims of common law fraud against Schmitz, Hughes, Saba, and Matthews. The defendants again moved to dismiss. Dkt. Nos. 81, 88, 92, 97, 100. On August 25, 2017, Plaintiffs filed an opposition to the motions to dismiss. Dkt. No. 110. The defendants filed their replies on September 8, 2017. Dkt. Nos. 111-14, 116.

### C. The Court's Opinion on the Defendants' Motions to Dismiss the FAC

On March 30, 2018, the Court issued a Memorandum Opinion and Order (the "Opinion") deciding the defendants' motions to dismiss the FAC. Dkt. No. 122. The Court granted the defendants' motions to dismiss and dismissed Plaintiffs' claims under Sections 10(b) and 20(a) of the Exchange Act as well as their common-law fraud claims.

In the Opinion, the Court explained why Plaintiffs' claims against Schmitz and Schwell failed. The Court concluded that, in the FAC, Plaintiffs had failed to adequately plead loss causation with respect to their claims against Schmitz and Schwell under Section 10(b) and Rule 10b-5. *See* Opinion at 32-33. Plaintiffs argued that Schmitz and Schwell's alleged misrepresentations concealed the risk of Arista's bankruptcy. FAC at ¶¶ 98-99. The Court did not agree. The Court found that the public filings that contained Schmitz and Schwell's alleged misrepresentations also contained numerous "express acknowledgements" and disclaimers that "shed light on the Company's bleak financial condition." *See* Opinion at 33-34. In light of the Company's public, unambiguous warnings of the possibility of bankruptcy, the Court held that, to adequately plead loss causation, Plaintiffs "were required to either plead facts sufficient to support an inference that the 2016 bankruptcy was caused by the alleged misstatements and omissions rather than by 'other salient factors' or facts to support an apportionment of the disclosed and concealed portions of the risk of bankruptcy." Opinion at 35 (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 177 ((2d Cir. 2005)). Because, in the FAC, Plaintiffs failed to plead such facts, the Court concluded that Plaintiffs

had failed to plead loss causation and the Court dismissed the claims against Schmitz and Schwell without prejudice. *Id.* at 35, 41.

The Court also dismissed Plaintiffs' claims under Section 20(a) because the FAC failed to adequately plead a primary violation. *Id.* at 35-36. With respect to Schmitz and Schwell, the Court explained, "[w]hile Plaintiffs allege control-person liability as to Schmitz, in his capacity as Arista's CEO, and Schwell, in his capacity as the chairman of Arista's board, it is not at all apparent from the face of the pleadings that either one of those [individuals] exercised actual control over the other in connection with the other's statements at issue in this case." *Id.* at 36.

Finally, the Court dismissed Plaintiffs' common-law fraud claim. *Id.* at 40-41. The Court concluded that Plaintiffs' common-law fraud claim against Schmitz failed because they had failed to plead loss causation. *Id.*

The Court granted Plaintiffs leave to replead their claims under Section 10(b) as asserted against Hughes, Schmitz, and Schwell. Plaintiffs were also granted leave to replead their claims under Section 20(a) as well as their common-law fraud claims against Hughes and Schmitz. The Court dismissed the remainder of Plaintiffs' claims with prejudice. *Id.* at 41-42.

### D. Plaintiffs File the SAC

On April 27, 2018, Plaintiffs filed their second amended complaint (the "SAC"). Dkt. No. 126. The SAC alleges largely the same facts as those that the Plaintiffs asserted in the FAC and that the Court described in broad strokes above. In the SAC, however, Plaintiffs assert claims only against Schwell and Schmitz. Specifically, in count one, Plaintiffs claim that Schmitz violated Section 10(b) and Rule 10b-5 for allegedly making fraudulent misrepresentations and actionable omissions in the False and Misleading SEC Filings and SPA. SAC at ¶ 78. Plaintiffs' theory for Schmitz's liability under Rule 10(b) mirrors the argument they presented in the FAC. In short, Plaintiffs again contend that Schmitz's purported misrepresentations and omissions regarding the

TMK Line of Credit in the Fraudulent SEC Filings fraudulently concealed Arista's inability to obtain financing on an arm's length basis from an unrelated third-party lender. *Id.* at ¶ 71. These misrepresentations, Plaintiffs again argue, masked the risk that the Company would go under. *Id.* at ¶¶ 72-74. Plaintiffs argue that they reference an additional fact in the SAC that allows them to adequately plead loss causation. In the SAC, Plaintiffs allege that Arista, as reflected in its January 2016 Chapter 7 bankruptcy petition, had assets of $1 and liabilities of more than $2 million. SAC at ¶¶ 74-75. Plaintiffs argue that the Company's single dollar in assets "unveiled" Schmitz's misrepresentations with respect to the TMK Line of Credit and revealed the Company's "historical inability to obtain a legitimate credit facility and truly significant risk that Arista would be unable to obtain lawful financing." *Id.* at ¶ 74. Because, as Plaintiffs claim, the $1 in assets evidenced the Company's inability to obtain "lawful[,] arms' length third party financing" the express acknowledgements of the risk of bankruptcy that Arista included in its public filings did not provide "substantial indicia of all of the risks concealed by Arista and Schmitz's fraud." *Id.* at ¶ 75.

In count two, Plaintiffs renew their claim under Section 20(a) against Schwell. *Id.* at ¶¶ 83-86. As before, Plaintiffs seek to impose liability on Schwell because, they claim, he was a "control person" within the meaning of Section 20(a) because of his alleged participation in the "fraudulent acts" in connection with Arista and the TMK Line of Credit and by virtue of his position as chairman of the Board of Directors, and his control over Arista and Schmitz. *Id.* at ¶ 84.

Finally, with their third count, Plaintiffs reassert their common law fraud claim against Schmitz based on the alleged misrepresentations that he made in the False and Misleading SEC Filings and the SPA, which Plaintiffs contend they relied on in deciding to purchase Arista securities. Below, the Court addresses the claims Plaintiffs assert in the SAC.

## III.    LEGAL STANDARDS

### A.  Rule 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). To determine plausibility, courts follow a "two-pronged approach." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (alterations and internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678). Second, a court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679). Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Because claims under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder sound in fraud, they are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA. *Novak v. Kasaks*, 216 F.3d 300, 306-07 (2d Cir. 2000). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy that requirement, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Novak*, 216 F.3d at 306). The PSLRA imposes similar requirements on claims brought under the Exchange Act: "the complaint shall specify each

statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged misstatement or omission. 15 U.S.C. § 78u-4(b)(2)(A). A complaint will survive under that heightened standard "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

In resolving a motion to dismiss under Rule 12(b)(6), courts generally may not consider materials extrinsic to the complaint. Fed. R. Civ. P. 12(d). However, that rule is not absolute. In addition to the facts alleged in the complaint, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI*, 493 F.3d at 98. Courts may also consider "matters of which judicial notice may be taken," *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted). Furthermore, on a motion to dismiss the Court can consider statements made in a company's public filings with the SEC. *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

## IV. DISCUSSION

As described above, with the SAC, Plaintiffs reassert claims against Schwell and Schmitz. Plaintiffs state claims under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as well as claims of common-law fraud against Schwell. Plaintiffs seek to impose control-person liability under Section 20(a) of the Exchange Act against Schmitz.

### A. Plaintiffs' Claims against Schmitz

#### 1. Fraudulent Misrepresentations Under Section 10(b) of the Exchange Act and Rule 10b-5

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe." 15 U.S.C. § 78j(b). Promulgated under authority granted to the SEC by Section 10, Rule 10b-5 makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

To state a claim under Section 10(b) and Rule 10b-5 for fraudulent misrepresentations, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *GAMCO Investors, Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014)).

Under Rule 10b-5, "[w]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." *Chiarella v. United States*, 445 U.S. 222, 235 (1980). A corporation does not have a duty to disclose information simply because it is material. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011); *see In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)) ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact."). Similarly, a corporation does not have a duty to disclose information simply because it suggests the corporation or its employees engaged in uncharged illegal conduct. *See, e.g.*, *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) ("[T]he federal

securities laws do not require a company to accuse itself of wrongdoing."). However, "[d]isclosure is required . . . when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading.'" *Matrixx*, 563 U.S. at 44 (omission in original) (quoting 17 C.F.R. § 240.10b-5(b)). Thus, "[w]hen a corporation does make a disclosure—whether it be voluntary or required—there is a duty to make it complete and accurate." *In re Marsh & Mclennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006) (citation omitted); *see also Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014) ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth."). A duty to disclose may also arise "expressly pursuant to an independent statute or regulation—i.e., an affirmative legal disclosure obligation." *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 561 (S.D.N.Y. 2011) (citation omitted).

### i. Loss Causation

"It is long settled that a securities-fraud plaintiff 'must prove both transaction and loss causation.'" *Lentell*, 396 F.3d at 172 (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994)); *accord Weiss v. Wittcoff*, 966 F.2d 109, 111 (2d Cir. 1992). To plead transaction causation, a plaintiff must plead simply that "but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." *Emergent Capital*, 373 F.3d at 197. "Loss causation" in the context of a private securities fraud action refers to a "causal connection between the material misrepresentation and the loss." *Dura Pharms, Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (citing 15 U.S.C. § 78u-4(b)(4)). To establish loss causation, "a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered." *Lentell*, 396 F.3d at 173.

A plaintiff may plead loss causation *either* by alleging (a) 'the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud;' or (b) that 'that the

loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 235 (2d Cir. 2014) (citing *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010) (internal quotation marks omitted)); *see also Lentell*, 396 F.3d at 175 n.4. With the SAC, as before in the FAC, Plaintiffs pursue their claims through the risk materialization theory.

Under a risk materialization theory, a misstatement or omission is "the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations.'" *In re Omnicom Grp.*, 597 F.3d at 513 (quoting *Lentell*, 396 F.3d at 173). A plaintiff's loss must be both a "foreseeable" consequence of the alleged misstatements and omissions, as well as the result of "the materialization of the concealed risk." *Lentell*, 396 F.3d at 173. Therefore, to state a claim under a risk materialization theory, a plaintiff must allege facts to show that the defendant's false statements and omissions concealed the risk that materialized and played "some part in diminishing the market value" of the securities. *Id.* at 176-77. In *Lentell*, the Second Circuit explained:

> where . . . substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk, a plaintiff must allege (i) facts sufficient to support an inference that it was defendant's fraud—rather than other salient factors—that proximately caused plaintiff's loss; or (ii) facts sufficient to apportion the losses between the disclosed and concealed portions of the risk that ultimately destroyed an investment.

*Id.* at 177.

Previously, Plaintiffs argued that the allegedly-concealed risk was Arista's potential for bankruptcy. In the FAC, Plaintiffs argued that the allegedly fraudulent misrepresentations and omissions with respect to (1) "Arista's business operations (or lack thereof)," (2) Arista's "ability (or lack thereof) to obtain financing," and (3) "the integrity (or lack thereof) of Arista's management" concealed the risk of Arista's bankruptcy, and thus caused Plaintiffs' losses when Arista filed for

bankruptcy and its stock price plummeted to nearly zero." FAC at ¶ 99.

As explained in the Opinion, in moving to dismiss the FAC, Schmitz argued that Plaintiffs' claims under Section 10(b) and Rule 10b-5 failed because they did not adequately plead loss causation. *See* Opinion at 32. The Court agreed. The Court concluded that the Company's SEC filings, which contained Schmitz's allegedly fraudulent statements, portrayed the Company's bleak financial condition as well as the risk of bankruptcy. *See* Opinion at 34-35. In light of the express, substantial indicia of the Company's risk of bankruptcy and, pursuant to the Second Circuit's direction in *Lentell*, the Court concluded that Plaintiffs were required to either plead facts sufficient to support an inference that it was the alleged misstatements and omissions—rather than other salient factors described in the Company's public filings—that caused the Company to file for bankruptcy in 2016 or facts to support an apportionment of the disclosed and concealed portions of the bankruptcy. *See* Opinion at 34-35. Because, in the FAC, Plaintiffs failed to plead such facts, the Court dismissed the claims brought under Section 10(b) and Rule 10b-5 without prejudice, providing Plaintiffs with the opportunity to present facts to adequately plead loss causation in light of *Lentell* in an amended complaint.

In filing the SAC, Plaintiffs have accepted the Court's invitation; however, their efforts to adequately plead loss causation still fall short. As explained above, Plaintiffs maintain the same theory for Schmitz's liability under Section 10b and Rule 10b-5—namely, that they relied on his material misrepresentations and omissions in the False and Misleading SEC Filings and the SPA in deciding to purchase Arista Securities. Plaintiffs, however, describe the risk at issue differently in the SAC. While, as described above, in the FAC Plaintiffs argued that the Company's potential bankruptcy was the concealed risk, in the SAC, they describe a "truly significant risk that Arista would be unable to obtain lawful financing" because of a "historical inability to obtain a legitimate credit facility." SAC at ¶ 74. Because of this risk, Plaintiffs claim that Arista "was . . . highly

susceptible to a liquidity crisis that could destroy the Company." *Id.*

In the SAC, Plaintiffs allege a single additional fact in their attempt to adequately plead loss causation. *See* SAC at ¶¶ 71-76; *cf.* FAC at ¶¶ 98-99; *see also* Dkt. No. 139, Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Plaintiffs' Opposition") at 8 (acknowledging that Plaintiffs allege one "important new fact" in the SAC). Plaintiffs draw the Court's attention to the fact that the Company had only $1 in assets and $2 million in liabilities (the "Asset-Liability Gap") in January 2016 when it filed its Chapter 7 bankruptcy petition.[3] Plaintiffs contend that the misrepresentations with respect to the TMK Line of Credit presented a misleading picture of the Company's ability to obtain financing and maintain adequate liquidity to sustain its operations. *See, e.g.*, SAC at ¶ 76 ("[G]iven Arista's disclosure in January 2016 that it had only $1 in the bank . . . it is reasonable to infer that the concealment by the TMK Line of Credit Fraud of Arista's ongoing inability to obtain lawful third-party arms' length financing proximately caused Plaintiffs' losses.").

This additional fact that Plaintiffs highlight in the SAC fails to adequately plead loss causation for their claims against Schmitz under Section 10b and Rule 10b-5. In the Opinion, the Court explained that Plaintiffs had to allege either "i) facts sufficient to support an inference that it was defendant's fraud—rather than other salient factors—that proximately caused plaintiff's loss; or (ii) facts sufficient to apportion the losses between the disclosed and concealed portions of the risk that ultimately destroyed an investment" because the public filings containing Schmitz's allegedly fraudulent statements also contained substantial indicia of the Company's risk of bankruptcy. Opinion at 32-33 (quoting *Lentell*, 396 F.3d at 177). The SAC's attempt to recast its prior allegations,

---

[3] Schmitz contests Plaintiffs' characterizing this as a new fact because Arista's bankruptcy petition was attached to his motion to dismiss the FAC. *See* Dkt. No 99-3. Schwell also notes that he attached the bankruptcy petition reflecting the Company's $1 in assets and $2 million in liabilities at the time that it filed for Chapter 7 in its motion to dismiss the FAC. *See* Dkt. No. 90-8.

together with the newly-pleaded Asset-Liability Gap does neither.  SAC at ¶ 74.

As discussed in-depth in the Opinion, the public filings issued by the Company before Plaintiffs executed the SPA portrayed its grim financial outlook.  In the Company's Form 10-K filed on March 28, 2013, it warned that:

> Recurring losses from operations raise substantial doubt about our ability to continue as a going concern.  The presence of the going concern explanatory paragraph may have an adverse impact on the relationships we are developing and plan to develop with third parties as we continue the commercialization of our products and could make it challenging and difficult for us to raise additional financing, all of which could have a material adverse impact on our business and prospects and result in a significant or complete loss of your investment.

Shepard Decl., Ex. 7 at 13.  Going concern disclaimers were common in the Company's public filings.  For example, months later in Arista's Form S-1 filed on October 3, 2013, the Company included a going concern disclaimer; it also alerted the public that Arista had "incurred significant losses in prior periods, and [that] losses in the future could cause the trading price of [its] stock to decline or have a material adverse effect on [its] financial condition, [its] ability to pay [its] debts as they become due and on [its] cash flows."  Wolff Decl., Ex. 10 at 6.  Furthermore, in the September 2013 10-Q, which was filed on November 12, 2013, the Company again included a going concern disclaimer.  Shepard Decl., Ex. 6 at 14.

In the SAC, Plaintiffs contend that the aforementioned disclaimers did not provide "substantial indicia" of the Company's risk for bankruptcy in light of Arista's "inability to obtain lawful arms' length financing."  SAC ¶ 75.  However, in the Form S-1 dated October 3, 2013— published months before Plaintiffs entered into the SPA—Arista specifically warned of potential difficulty in raising funds.  The Company wrote:

> We believe that, in addition to the capital raised thus far in 2013, we will require significant additional capital to fund our operating cash needs and our anticipated growth.  In addition, if we are unable to

> generate the projected amount of revenue and profits from our operations, **we will need to seek additional financing to fund out operating cash needs and our anticipated growth . . . . there can be no assurance that acceptable financing necessary to further implement our plan of operation can be obtained on suitable terms, if at all.**

*Id.*, Ex. 10 at p. 6 (emphasis added).

Contrary to Plaintiffs' assertion that the $2 million Asset-Liability Gap displayed in the Company's bankruptcy filings represents an "important new fact," the Company's financial disclosures made clear that Arista was in the hole well before it filed for bankruptcy. In the Company's September 2013 10-Q, for instance, Arista disclosed that it had total assets of $3,072,217 and total liabilities of $4,482,315—making the company worth -$1,410,108 in the fall of 2013, prior to Plaintiffs' investment and over two years before the Company filed for bankruptcy.[4] *Id.* at 3. That the Company's balance sheet was pear shaped was disclosed to Plaintiffs prior to their investment, which undermines their claim that the Asset Liability Gap reflected in the 2016 Chapter 7 petition "revealed" Arista's "high risk of suffering a liquidity crisis." SAC at ¶ 73.

In addition to the Company's financial woes, it also warned about its dismal operational outlook. In multiple public filings, Arista provided the following warning:

> Although we believe that there is a substantial market for our Mobile Renewable Power station, our Power on Demand system, our Renewable Power Station, and reselling solar PV systems, we have limited experience [in] selling such products and, to date, have had limited success in selling such products and therefore there can be no assurances that (1) a market exists for any of those products, or (2) if a market does exist for any or all of those products, that we will be successful in selling into such market or markets.

Arista Form 10-K for the fiscal year ended December 31, 2011, Shepard Decl., Ex. 4 at 18; *see also*

Arista Form 10-K for the fiscal year ended December 31, 2012, Shepard Decl., Ex. 5 at 15 (same);

---

[4] The 10-K filed by the Company on March 31, 2014—the same day that Plaintiffs entered into the SPA—revealed that the Company had $2,379,485 in assets and $3,269,150 in liabilities as of December 31, 2013—making the company worth negative $1,668,230. Shepard Decl., Ex. 7 at F-3.

Arista Form 10-K for the fiscal year ended December 31, 2013, Shepard Decl., Ex. 7 at 14 (same). Thus, the Company suffered from multiple prominent issues—its poor financial condition, stated difficulty in obtaining financing, and poor operational experience and performance.

For these reasons, the Court cannot conclude that the SAC adequately pleads loss causation. Schmitz misrepresented the source of the TMK Line of Credit. Plaintiffs ask the Court to accept that Schmitz's alleged misrepresentations regarding the source of the TMK Line of Credit "concealed . . . the true high magnitude of the risk that Arista would be unable in the future to obtain financing for its operations." SAC at ¶ 71. However the ultimate failure of the Company that resulted in the loss of Plaintiffs' investment is neither the "foreseeable" consequence of the alleged misstatements and omissions, nor the result of "the materialization of the concealed risk." Schmitz's alleged misrepresentations regarding the source of that loan cannot be demonstrated to have prevented the Company from obtaining funds to continue operations, or to have caused the Company's liquidity crisis, and its eventual bankruptcy. Other salient factors driving those consequences are apparent from the Company's financial disclosures.

At the outset, the Court highlights the lengthy temporal gap between the date of the alleged misrepresentations and the Company's failure. Schmitz made the alleged misrepresentations in 2012, two years before Plaintiffs' investment and four years before the Company filed for bankruptcy. The extended period between the alleged misrepresentations and their asserted consequences makes Plaintiffs' claim tenuous.

As described in depth above, and in the Opinion, there are multiple salient factors that clearly contributed to the Company's failure. They bar the conclusion that the alleged misrepresentations caused Plaintiffs' losses. The Company's financial woes were described in detail in its public filings, including the "recurring losses" described in its March 28, 2013 10-K and the "significant losses" that it described in its October 2013 S-1. The Company qualified its financial

statements with going concern warnings. The financial disclosures showed that the Company had a negative shareholder equity of nearly $1.5 million prior to Plaintiffs' investment—the Company's upside down capital structure was clearly demonstrated by the company's financial statements. To the extent it could not be descried from these financial red flags, the high magnitude of risk that the Company would be unable to obtain future financing was expressly disclosed by the Company. *See* Shepard Decl., Ex. 10 at 6-7. The Company also disclosed that it had profound operational challenges. All of these resulted in the Company's liquidity crisis and ultimate demise.

As before, the Court must consider the substantial indicia of the Company's financial and operational troubles as articulated in public filings in order to gauge whether Plaintiffs have adequately pleaded loss causation. In their reformulated SAC, which highlights the "new" fact revealed by the Asset-Liability Gap, Plaintiffs have not pleaded sufficient facts to raise an inference that it was Schmitz's alleged misrepresentations and omissions about the source of the funds behind the TMK Line of Credit between 2012 and 2014 that caused their loss in 2016.

In its prior Opinion, the Court made clear that Plaintiffs needed either to plead facts sufficient to support an inference that their loss was caused by Schmitz's alleged misstatements and omissions or facts to support an apportionment of the disclosed and concealed portions of the risk of bankruptcy. While Plaintiffs have targeted the former, they again have missed the mark. Because Plaintiffs have failed to adequately plead loss causation, their claims against Schmitz under Section 10(b) and Rule 10b-5 are dismissed.[5]

---

[5] In their Opposition, Plaintiffs introduce a new theory to support their claim against Schmitz under Section 10(b) and Rule 10b-5. Specifically, they contend that if the Company had a line of credit worth $1.25 million with an unrelated third-party it "could have tapped such facility and avoided bankruptcy." Opposition at 9; *see also id.* at 2. Because Plaintiffs failed to make these allegations in the SAC, the Court will not consider them in deciding the instant motions to dismiss. *See, e.g., Quinones v. City of New York*, No. 16-CV-0985 (GBD) (DF), 2017 WL 1322205, at *4 (S.D.N.Y. Jan. 6, 2017) ("On a motion to dismiss a complaint . . . a court is generally constrained to look only to the pleadings." ); *Chukwueze v. NYCERS*, 891 F. Supp. 2d 443, 448 (S.D.N.Y. 2012)("[A] court generally may not look outside the pleadings when reviewing a 12(b)(6) motion to dismiss."); *see also* 5 Wright, Miller & Kane, Federal Practice and Procedure Civil 3d § 1363. In any event, this argument is not plausible. As described above, the Company disclosed

### ii. Material Misrepresentation

In his memorandum of law in support of his motion to dismiss, Schwell argues that

Plaintiffs' claims against Schmitz under Section 10b and Rule 10b-5 fail because the

misrepresentations and omissions that Plaintiffs allege that he made are not material. *See* Dkt. No.

134 at 22-25. Schmitz adopts Schwell's arguments regarding the materiality of the alleged

misrepresentations and omissions. *See* Dkt. No. 140 at 7. A misrepresentation or omission is

material when there is a "substantial likelihood" that it "would have been viewed by the reasonable

investor as having significantly altered the 'total mix' of information available." *Basic, Inc. v. Levinson*,

485 U.S. 224, 231-34 (1988). At the pleading stage, a plaintiff satisfies the materiality requirement of

Rule 10b-5 by "alleging a statement or omission that a reasonable investor would have considered

significant in making investment decisions." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161-62 (2d

Cir. 2000). A complaint "may not properly be dismissed . . . on the ground that the alleged

misstatements or omissions are not material unless they are so obviously unimportant to a

reasonable investor that minds could not differ on the question of their importance." *ECA & Local

134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (internal

citation and quotations omitted).

Because the Court has already determined that Plaintiffs fail to adequately plead loss

causation with respect to their claims against Schmitz under Section 10b and Rule 10b-5, and,

because "the trier of fact usually decides the issue of materiality," it declines to reach the issue of

whether the misrepresentations and omissions that Plaintiffs identify in the SAC satisfy the

materiality standard as articulated in *Basic*. *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 181

(S.D.N.Y. 2010); *see also In re Warnaco Grp. Inc. Sec. Litig.*, 388 F. Supp. 2d 307, 313 (S.D.N.Y. 2005)

---

that the line of credit matured in 2014. Shepard Decl., Ex. 6 at 7. No reasonable investor could expect that additional
funding would be available following the facility's stated maturity date.

(materiality "is generally inappropriate for determination at the pleading stage."); *Doscher v. Sobel & Co., LLC*, No. 14 CIV. 646 RMB, 2015 WL 774695, at *6 (S.D.N.Y. Feb. 11, 2015) (declining to address additional grounds upon which defendants sought to dismiss plaintiff's claim under Rule 10b-5 once court determined that the claim failed to satisfy one of the required elements).

### 2. Common-Law Fraud

As explained above, Plaintiffs reallege a claim of common law fraud against Schmitz in the SAC. *See* SAC at ¶¶ 87-90. To state a claim for common-law fraud under New York law, "a plaintiff must show a material representation or omission of fact, made with knowledge of its falsity, with scienter or an intent to defraud, upon which the plaintiff reasonably relied, and that such reliance caused damage to the plaintiff." *In re Tremont Secs. Law, State Law and Ins. Litig.*, 703 F. Supp. 2d 362, 371 (S.D.N.Y. 2010) (internal citation omitted). The elements required to plead common law fraud under New York law are "essentially the same" as those required to plead a claim under Section 10(b) of the Exchange Act and Rule 10b-5. *See, e.g.*, *Tremont Secs. Law*, 703 F. Supp. 2d at 372 (holding that, because plaintiffs' Section 10(b) claim did not survive dismissal, plaintiffs' common-law claim for fraud based on the same allegations of fact "must be dismissed as well"); *see also Meridian Horizon Fund, LP v. Tremont Grp. Holdings, Inc.*, 747 F. Supp. 2d 406, 414 (S.D.N.Y. 2010). Because, as explained above, Plaintiffs fail to allege facts in the SAC to adequately plead loss causation with respect to their claims against Schmitz under Section 10b and Rule 10b-5, the Court also dismisses Plaintiff's common-law fraud claims.

### B. Plaintiffs' Claim Against Schwell

"Any claim for 'control person' liability under § 20(a) of the Exchange Act must be predicated on a primary violation of securities law." *Pacific Inv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144, 160 (2d Cir. 2010). "To state a claim of control person liability under § 20(a), 'a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by

the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'" *Barclays*, 750 F.3d at 236 (quoting *ATSI*, 493 F.3d at 108). Here, Plaintiffs' claim under Section 20(a) against Schwell fails because the SAC fails to adequately plead a primary violation. Accordingly, Plaintiffs' claims under Section 20(a) are dismissed.

## V.    LEAVE TO AMEND

The decision to grant or deny leave to amend lies within the Court's discretion. *Lobatto v. Berney*, No. 98 CIV. 1984 SWK, 1999 WL 672994, at *10 (S.D.N.Y. Aug. 26, 1999)(citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962)). Although Fed. R. Civ. P. 15(a)(2) requires the Court to "freely give leave [to amend] when justice so requires," this rule must also "be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. The Court denies Plaintiffs leave to replead the dismissed claims. The SAC represents the third complaint Plaintiffs have filed in this action. They have already been given an opportunity to cure deficiencies that the Court identified in the Opinion. Furthermore, as explained above, in the Opinion the Court explicitly described what Plaintiffs needed to allege to adequately plead loss causation for the primary violation of the Exchange Act that they alleged. In filing the SAC, Plaintiffs have again failed to allege facts to adequately plead their claims despite clear instruction from the Court in the Opinion on how to do so. Accordingly, the Court denies Plaintiffs leave to replead. *See Rutolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008); *see also Steadman v. Mayo*, No. 09 CIV. 5154 DAB MHD, 2012 WL 1948804, at *6 (S.D.N.Y. Mar. 27, 2012) (denying plaintiff leave to replead and dismissing claims with prejudice where he failed to state adequate factual allegations after the court had dismissed a prior complaint and explained that plaintiff failed to allege adequate facts).

## VI.    CONCLUSION

For the reasons stated herein, Defendants' motions are granted.  Plaintiffs' claims, as articulated in counts one through three, are dismissed with prejudice and Plaintiffs are denied leave to replead the dismissed claims.

The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 133 and 136 and to close this case.

SO ORDERED.

Dated:  March 30, 2019
       New York, New York

                                      GREGORY H. WOODS
                             United States District Judge